Case 2:12-cv-05796-ADS   Document 1-1   Filed 11/28/12   Page 1 of 81 PageID #: 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THOMAS F. GREEN,

                          Petitioner,

          -v.-

WILLIAM LEE, Superintendent of Green
Haven Correctional Facility,

                          Respondent, and

THE ATTORNEY GENERAL OF THE
STATE OF NEW YORK,

                          Additional Respondent.

CV 12-

RONALD L. KUBY [RK-1879]
LEA SPIEGEL [LS-0456]
Law Office of Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, New York 10011
(212) 529-0223

For Petitioner Thomas F. Green

Dated:        New York, New York
              November 21, 2012

# TABLE OF CONTENTS

Table of Cases and Authorities ................................................................ iv

Introduction .................................................................................................. 1

Statement of Facts ...................................................................................... 6

    I.    The Indictment ................................................................... 6

    II.    The Prosecution's Case ..................................................... 7

        A. The Halloween Photograph .......................................... 11

        B. The Turbo Twist Speller ............................................... 11

        C. The Coney Island Photograph: "The One Piece Of
           Evidence In The Whole Case That Is Not Capable
           Of Lying" ....................................................................... 14

    III.    The Defense Case ............................................................... 16

    IV.    Rebuttal ................................................................................ 19

    V.    Summations ......................................................................... 20

    VI.    Verdict & Sentence ........................................................... 22

    VII.    The Post-Trial Investigation ........................................... 22

        A. The Coney Island Photograph .................................... 23

        B. The Halloween Photograph .......................................... 25

        C. The Turbo Twist Speller ............................................... 27

        D. Law & Order: Special Victims Unit ............................ 28

i

B.  Argument:  The County Court's Finding That There Was No Evidence That The Prosecution Knew Or Should Have Known The Evidence Was False Was An Unreasonable Determination Of The Facts In Light Of The Evidence Presented ....................................... 61

C.  Argument:  Even Absent The Prosecution's Knowledge, The Admission Of The Material False Evidence Violated Petitioner's Right To Due Process Under The Fourteenth Amendment. ................................................. 67

    1.  The County Court Never Adjudicated The Due Process Issue, But This Court May Consider The Nature Of The Evidence, And Its Impact, In The First Instance. ............................................................. 67

    2.  The False Dating Of The Prosecution's Key Physical Evidence, Which Bolstered The Stories And The Credibility Of The Complainants And Undermined The Petitioner's Core Defense That He Did Not Know The Complainants At The Time The Sexual Abuse Allegedly Occurred, Was Essential To Petitioner's Conviction. ................. 71

CONCLUSION ...................................................................................... 74

# TABLE OF CASES AND AUTHORITIES

## Cases

Bracy v. Gramley,
520 U.S. 899 (1997) ................................................................ 66

Byrd v. Trombley,
580 F.Supp.2d 542 (E.D. Mich. 2008) (report and recommendation adopted),
aff'd, 352 Fed. Appx. 6 (6th Cir. 2009) ................................................ 55

Channer v. Brooks,
320 F.3d 188 (2d Cir. 2003) ........................................................ 70

Chatom v. White,
858 F.2d 1479 (11th Cir. 1988) .................................................... 51

Crisp v. Duckworth,
743 F.2d 580 (7th Cir. 1984) .................................................. 45, 53

Drake v. Portuondo,
321 F.3d 338 (2d Cir. 2003) ....................................... 63-64, 66, 67, 69

Drake v. Portuondo,
553 F.3d 230 (2d Cir. 2009) .................................................. 64, 66-67

Durley v. Mayo,
351 U.S. 277 (1956) ................................................................ 69

Eze v. Senkowski,
321 F.3d 110 (2d Cir. 2003) .................................................... 43, 46

Gersten v. Senkowski,
299 F.Supp.2d 84 (E.D.N.Y. 2004), aff'd, 426 F.3d 588 (2d Cir. 2005),
cert denied, 547 U.S. 1191 (2006) ........................... 36, 42-43, 46-47, 54-56, 58-59

Giglio v. United States,
405 U.S. 150 (1972) .......................................................... 64, 65

iv

Greiner v. Wells,
417 F.3d 305 (2d Cir. 2005) ................................................................... 41

Harris v. Artuz,
288 F.Supp.2d 247 (E.D.N.Y. 2003),
aff'd, 100 Fed. Appx. 56 (2d Cir. 2004) ................................. 45-46, 64, 69

Harris v. Kuhlmann,
346 F.3d 330 (2d Cir. 2003) ................................................................... 36

Hart v. Gomez,
174 F.3d 1067 (9th Cir. 1999) ....................................................... 41, 44, 51

Henry v. Poole,
409 F.3d 48 (2d Cir. 2005), cert denied, 547 U.S. 1040 (2006) ................. 35-36, 37

Holsomback v. White,
133 F.3d 1382 (11th Cir. 2000) ....................................................... 45, 51

Jenkins v. Artuz,
294 F.3d 284 (2d Cir. 2002) ................................................................... 63

Kimmelman v. Morrison,
477 U.S. 365 (1986) ................................................................................ 38

Kyles v. Whitley,
514 U.S. 419 (1995) ................................................................................ 65

Lindstadt v. Keane,
239 F.3d 191 (2d Cir. 2001) ................................................. 42, 48-51, 53-60

McDonald v. Johnson,
139 F.3d 1056 (5th Cir. 1998) ............................................................... 67

Mooney v. Holohan,
294 U.S. 103 (1935) ................................................................................ 63

Napue v. Illinois,
360 U.S. 264, 269 (1959) ......................................................................... 65

v

Ortega v. Duncan,
333 F.3d 102 (2d Cir. 2003) ............................................................ 69-72

Pavel v. Hollins,
261 F.3d 210 (2d Cir. 2001) ...................................................40-41, 44, 53

Rompilla v. Beard,
545 U.S. 374 (2005) ............................................................................ 41

Sanders v. Sullivan,
863 F.2d 218 (2d Cir. 1988) ........................................................... 68, 69

Sanders v. Sullivan,
900 F.2d 601 (2d Cir. 1990) .................................................................. 61

Shih Wei Su v. Filion,
335 F.3d 119 (2d Cir. 2003) .................................................................. 64

Strickland v. Washington,
466 U.S. 668 (1984) ....................................................... 36-40, 48-49, 54

United States v. Agurs,
427 U.S. 97 (1976) ........................................................................ 63-64

United States v. Gallego,
191 F.3d 156 (2d Cir. 1999) .................................................................. 64

United States v. Morales,
185 F.3d 74 (2d Cir. 1999) .................................................................... 57

United States v. Naiman,
211 F.3d 40 (2d Cir. 2000) .................................................................... 57

United States v. Seijo,
514 F.2d 1357 (2d Cir. 1975) ................................................................ 71

United States v. Stoksky,
527 F.2d 237 (2d Cir. 1975) .................................................................. 71

vi

United States v. Tucker,
716 F.2d 576 (9th Cir. 1983) .................................................................. 51

United States v. Wallach,
935 F.2d 445 (2d Cir. 1991) ................................................................... 70

United States ex rel. Williams v. Brown,
721 F.2d 1115 (7th Cir. 1983) ................................................................ 51

Vasquez v. Hillery,
474 U.S. 254 (1986) ........................................................................ 66-67

Williams v. Taylor,
529 U.S. 362 (2000) ............................................................................. 36

Williams v. Washington,
59 F.3d 673 (7th Cir. 1995) ................................................... 44, 50-51, 53

## Authorities

28 U.S.C. § 2254(d)(1) ................................................................ 35-36, 63

28 U.S.C. § 2254(d)(2) ...................................................................... 61

N.Y. Criminal Procedure Law § 440.10  .......................................... 33-35

U.S. Constitution, Amend. VI  ..................................................... 34, 36-40

U.S. Constitution, Amend. XIV  .......................................... 34, 60-61, 63-64

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                                           )
THOMAS F. GREEN,                                           )
                                                           )
                          Petitioner,                      )          Index No.
             -v-                                           )
                                                           )
WILLIAM LEE, Superintendent of Green                       )
Haven Correctional Facility,                               )
                                                           )
                          Respondent, and                  )
                                                           )
THE ATTORNEY GENERAL OF THE                                )
STATE OF NEW YORK,                                         )
                                                           )
                          Additional Respondent.  )
-----------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254

Petitioner Thomas F. Green, by his attorneys, The Law Office of Ronald L.

Kuby, respectfully submits this Memorandum of Law in support of his Petition,

under 28 U.S.C § 2254, for a Writ of Habeas Corpus by a person in state custody.

### INTRODUCTION

After a three-week jury trial in the County Court of the State of New York,

Suffolk County, the petitioner, Thomas F. Green – a 61-year-old grandfather with no

prior criminal history – was wrongfully convicted of sexually molesting his minor

granddaughter and two of her former friends from the neighborhood.[1]  Petitioner has always maintained his complete innocence of all of the charges.  The core of his defense at trial was that the troubled young girls had fabricated the allegations in search of attention, and that he could not have committed these offenses because he had not even met his accusers during the years they claimed he abused them.

The case began with a ten-count indictment that charged crimes in the remote past that allegedly occurred during time frames so broad as to be impossible to defend. (See Exhibit A, Suffolk County Indictment 1169/2007).[2] The most serious counts charged Petitioner with first degree sodomy against alleged victim Barbara Monaco and attempted sodomy in the first degree against Gina Green (Petitioner's granddaughter).  These acts allegedly took place one night sometime between "the end of 1998 and the beginning of 1999" when the girls were seven and six years old, respectively.  Barbara, the first of the complainants to accuse Petitioner of sexual abuse, did not come forward until nearly a decade after the alleged crimes.  In the autumn of 2006, about a year after the friendship between Barbara and Gina ended, (Tr. 586-587, 756, 995-999),[3] Barbara accused Petitioner of sexually abusing her and Gina Green one night some eight years earlier. (Tr. 813).  Gina denied any abuse had taken place. (Tr. 994-995).

---

[1] Petitioner was acquitted of three counts of sexual abuse involving two other complainants.

[2] The exhibits referenced herein are included in the Appendix of Exhibits submitted herewith.

[3] Numbers in parentheses preceded by "Tr." refer to the pages of the trial transcript.

Shortly thereafter, another former friend, Kerri Petersen, accused Petitioner of sexual molestation, followed by Kerri's sister Brittany, and Brittany's friend Stephanie Belkin. (Tr. 818).   Petitioner was charged with misdemeanor sexual abuse in the second degree against Barbara Monaco, and first and second degree sexual abuse against Kerri Petersen, alleged to have been committed in the summer of 2003.   Petitioner was acquitted of the accusations leveled by Brittany and Stephanie.[4]

This lengthy, emotionally-charged trial alleging sexual abuse of children who came forward as teenagers, years after the alleged crimes, was a classic credibility contest between the accusers and their friends and family on one side, and the accused and his on the other.   There was no physical evidence of sexual abuse, and no disinterested witness other than the prosecution's expert on child sexual abuse syndrome.[5] The issue of credibility was made even closer by the fact that one of the alleged victims, Gina, was the granddaughter of the accused, and she consistently maintained (pretrial, at trial, and today) that no sexual abuse took place and that the other four girls were lying.

---

[4] Petitioner was acquitted of two counts of sexual abuse in the first degree against Stephanie and one count of sexual abuse in the first degree against Brittany, alleged to have been committed in 2001.

[5] This expert offered an explanation as to the "post-crime behavior of the complainants that might have appeared to be unusual or which the jurors may not have otherwise understood." People v. Green, 92 A.D.3d 894, 896 (2d Dept. 2012).

At trial, Thomas F. Green took the stand in his own defense. He and other family members described the Green home as a place where Gina, her friends, and other children in the neighborhood would come to play, visit the pool, eat, and sleep over. At one point in her young life – the "when" being the critical contested issue at trial – Barbara, a young girl with a troubled family life, met Gina and formed a strong friendship with her. (Tr. 974, 977, 979). By virtue of that friendship, Barbara was accepted into the Green home. (Tr. 977). As children, Kerri and her younger sister, Brittany, also spent time at the Green home. (Tr. 980-981). Petitioner was proud of creating an environment where his many grandchildren and their friends felt at home. He adamantly denied that any abuse, or any sexual contact of any kind, had ever taken place.

By the prosecution's own acknowledgment, the central issue at trial was whether Petitioner and his granddaughter Gina **even knew** the accusers in 1998 and 1999, when the alleged abuse took place, or whether the accusers and Gina met after 1999 and began spending time together at that point. If the girls did not know each other until after the turn of the century, as the defense maintained, Petitioner **could not have** abused them earlier. Conversely, if the prosecution could prove that the girls started spending time at the Green home before that time, the credibility of the accusers was corroborated, and Petitioner and others who testified on his behalf would be shown to be liars. Physical evidence that showed

4

Gina with one of the accusers in 1998 or 1999 would, according to the prosecutor, "sink" Petitioner; it would be the "one piece of evidence not capable of lying."

The prosecution introduced three pieces of such evidence. But each of these three pieces of physical evidence was proved to be fraudulent after trial. Defense counsel at trial could have, but singularly failed to, conduct the most rudimentary investigation to accurately date these crucial items that the prosecution relied upon both as the main support of its case and to discredit defense witnesses.

The perfect storm for Petitioner's deprivation of rights having been permitted to form and fester, the truth was kept from the jury and the unexposed lies and false evidence unquestionably resulted in Thomas F. Green's wrongful conviction. Following the denial of his presentence motion to set aside the verdict, (see Exhibit B, Decision & Order, Hon. Barbara Kahn, June 29, 2009), the subsequent denial of his motion to vacate the conviction, (see Exhibit C, Decision & Order, Hon. Barbara Kahn, Dec. 14, 2009), the affirmance of his conviction by the Appellate Division, (see Exhibit E, Decision & Order of the Appellate Division, Second Department, Feb. 21, 2012), and the denial of leave to appeal to those decisions, (see Exhibit D, Decision & Order, Hon. Reinaldo E. Rivera, April 7, 2010; Exhibit F, Order, Hon. Susan Phillips Read, June 29, 2012), Thomas F. Green now files the instant federal habeas corpus petition. He is now sixty-six years old. He is

5

a husband, father of four children, and grandfather of ten, the youngest of which was born during his incarceration. (See Tr. 2064, 2084).

## STATEMENT OF FACTS

### I.  The Indictment

On April 17, 2007, a Suffolk County Grand Jury indicted Petitioner on ten counts related to the alleged sexual molestation of his granddaughter and four girls from the neighborhood.  Counts one through four involved an incident that allegedly took place "on or about and between the end of 1998 and beginning of 1999." (Exhibit A).  It was alleged that on that occasion, Petitioner committed the crime of sodomy in the first degree twice against Barbara Monaco (counts 1 and 2), and sexual abuse in the first degree against Barbara Monaco (count 4).  It was further alleged that on that occasion, Petitioner committed the crime of attempted sodomy in the first degree against Gina Green (count 3).

Count ten accuses Petitioner of committing the crime of sexual abuse in the second degree against Barbara Monaco "on or about the summer of 2003." (Exhibit A).

Counts eight and nine, charging first-degree sexual abuse (count 8) and second-degree sexual abuse (count 9) against Kerri Petersen, also allege the "on or about the summer of 2003" time period.

6

Likewise, count five (5) alleges first-degree sexual abuse of Brittany Petersen during that 2003 time period.

Finally, counts six and seven allege first-degree sexual abuse against Stephanie Belkin "during the summer of 2001" (count 6) and "on or about the summer of 2001" (count 7). (Exhibit A).

## II.   The Prosecution's Case

Trial commenced with jury selection on July 23, 2008. The prosecution emphasized in its opening statement that when Barbara was seven years old, in the winter of 1998 to 1999, she "spent all of her time with her best friend, Gina Green" (tr. 40), and "the two girls ... spent almost every weekend together at Gina's grandfather's [Petitioner's] house." (Tr. 41). In trial counsel's opening statement, he made equally plain that the centerpiece of the defense was simple: there was no abuse in the winter of 1998-1999 because they did not even know each other at this time: "Barbara Monaco is absolutely wrong. She did not spend time in Mr. Green's presence and with his granddaughter [Gina] in 1998." (Tr. 54). The dispute over whether the girls knew each other, and spent time with Petitioner, formed the crux of the issue at play during trial.[6]

**Barbara Monaco** testified that she met Gina Green when Barbara was 7 years old, and that Gina was her best friend. (Tr. 513-514). Barbara testified that

---

[6] If Barbara was shown to be lying about this incident, it is extremely unlikely that the jury would have believed her about the 2003 incident (count 10).

she began spending the night at Petitioner's home when she was 7 years old, in 1998. (Tr. 522).   According to Barbara, she and Gina slept at Petitioner's home "every weekend" and "every day" during the summer. (Tr. 522).   This continued, according to Barbara, until she was 14 years old, in the year 2005. (Tr. 522). Barbara claimed that at some point during the winter of 1998-1999, either before or after her 8th birthday on February 25, 1999, she was sexually molested by Petitioner. (Tr. 541-542).

As to counts one through four, in brief, Barbara testified that on a Friday, sometime in or about the winter of 1998-1999, she, Gina, and Petitioner went together

> to the movies and then we went to Sports Plus, and we went bowling and then went ice skating for a little bit, and then on our way home from there…we stopped at Eckerd's and we bought like jewelry and everything … [a]nd then we went to Blockbuster and rented a movie.  And then after that we went home and we were watching [the movies].

(Tr. 543).  On cross-examination, Barbara added that the activities also included a group stop at McDonald's, (Tr. 681, 683), and that after this exhaustive, activity-filled evening, the group then proceeded to watch two movies that evening at Petitioner's home. (Tr. 686).

When the day finally came to an end, and the girls went to sleep, Barbara claims that she woke up to discover Petitioner molesting her. (Tr. 545).  Barbara testified that after discovering him molesting her, she just went back to sleep but

8

was later awakened by Gina Green who "punched [Barbara] in the face ... because she [Gina] woke up to him [Petitioner] trying to do the same thing to her." (Tr. 545). Barbara claimed that she instructed Gina to kick Petitioner in the face, which she did. (Tr. 545). The two, according to Barbara, then ran into the next room and locked the door. (Tr. 545, 548). At some point, Barbara alleges that Petitioner entered the room and testified "that was it for the night." (Tr. 549). After prodding by the ADA, Barbara then recollected that Petitioner allegedly put his penis in Barbara's mouth until ejaculation. (Tr. 549-550).

Barbara was questioned as to why she did not come forward earlier. She claimed that the reason she did not come forward immediately was she had seen Law & Order: Special Victims Unit—a television program that deals with the investigation and prosecution of sex abuse cases—and learned from the program that it was often difficult for victims to testify in court. (Tr. 710-712).

As with many of the witnesses, Barbara Monaco's direct and cross-examinations were largely dedicated to establishing whether she in fact knew Petitioner during the time period that the alleged abuse occurred. Barbara repeatedly testified that she met Gina Green in the summer of 1998, (Tr. 647), and was abused by Petitioner in the winter of 1998-1999. (Tr. 669, 677). Several other witnesses offered testimony bolstering Barbara's account that the incident allegedly happened in 1998-1999.

9

**Kerri Petersen** testified in an effort to corroborate Barbara's account of her friendship with Gina, offering that when Kerri met Barbara and Gina they were 7 or 8 years old. (Tr. 163). The three of them would spend time at Petitioner's house and enjoy the use of his pool. (Tr. 165). Kerri confirmed that the pool was operating and in use in 1998. (Tr. 176-177).[7]

According to Kerri, sometime in the summer of 2003, when she was "about twelve," Petitioner took her to a Carvel ice cream store. When the salesperson went to get her ice cream, she claimed that Petitioner, who was standing behind her, took her hands, put them behind her back, and made her touch his penis for "like a minute." (Tr. 206-208). Kerri repeatedly insisted that she had met Barbara Monaco and Gina Green at the same time, (Tr. 163, 281), and that the three of them started "hanging out" at Petitioner's home in 1998. (Tr. 281).

**Detective Amy Goldstein** similarly testified that Barbara told her the incident happened "[a]fter her seventh birthday, in the winter time" of 1998. (Tr. 830).

In order to bolster Barbara's account of the abuse, and the existence of her purported relationship with both Gina and Petitioner during the relevant time

---

[7] Petitioner and other defense witnesses testified that the pool—which Barbara and Kerri claimed to have played in during the relevant time period—was actually inoperable at that time. Days of testimony were consumed by examination of prosecution and defense witnesses regarding the operability of the pool during the relevant time period. Multiple exhibits were introduced, and challenged, depicting the pool in various states of working condition and disrepair. The entire issue of the operability of the pool in 1998 and 1999 was directly relevant to whether Barbara and Kerri associated with Gina and the Green family during this time period.

period, the prosecution presented several pieces of physical evidence allegedly documenting the existence of such a relationship during the time period. Beyond the he-said/she-said nature of the conflicting testimony offered by Barbara, Kerri, Gina, and collateral witnesses, these pieces of physical evidence were offered to the jury as the proverbial smoking gun: hard evidence that demonstrably established the existence of a relationship that Gina and several defense witnesses denied.

### A. The Halloween Photograph

The prosecution introduced a photograph of Gina and Barbara together, dressed in Halloween costumes. (People's Exhibit 18 at trial)[hereinafter "the Halloween photograph]. A copy of the Halloween photograph is annexed hereto as Exhibit G.

At trial, Barbara testified that the Halloween photograph was taken "[o]n Mr. Green's front porch, on his lawn" when Barbara was "seven" years old. (Tr. 516-517). Barbara was seven years old during the Halloween of 1998. As such, People's Exhibit 18 served as compelling physical proof that Barbara and Gina knew each other and, presumably, knew Petitioner in 1998.

### B. The Turbo Twist Speller

The prosecution also put into evidence a "Turbo Twist Speller"—a device designed to help children learn to spell—that was allegedly given by Petitioner to

Barbara to help her with spelling. (Tr. 580)(People's Exhibit 20 at trial). Barbara testified that Petitioner gave her the Turbo Twist Speller "when I started failing school...for spelling" which was in "third grade." (Tr. 580). Barbara was in the "third grade" in 1999. (Tr. 521).[8]  The "Turbo Twist Speller" was offered as additional evidence documenting the relationship between Petitioner and Barbara during the time period Petitioner stood accused of molesting Barbara.

**Gina Green**, called by the prosecution, not only insisted the abuse never occurred, she also explicitly and repeatedly denied even knowing Barbara in 1998-1999. Gina testified that it was not until 2000 that she met Barbara, and that she did not begin regularly "hanging out" with Barbara until 2001. (Tr. 977). Gina testified that she was never at Petitioner's house in 1998 and did not start staying over at his home until she was "eight" years old in November 2000. (Tr. 974). On direct examination, Gina made it absolutely clear:

Q:     So you didn't hang out with Barbara Monaco before 2001?

A:     No….

(Tr. 979). See also Tr. 1082 (did not hang out with Barbara in 1998); Tr. 1082 (did not hang out with Barbara in 1999).   Gina remembered when she became friends

---

[8] Barbara repeated third grade.  She testified that the defendant gave her the speller when she "started failing school, third grade, for spelling …." (Tr. 580).  She started third grade in the 1999 school year, then repeated third grade in the 2000 school year. (Tr. 521).

12

with Barbara, because they became friends through their participation in BMX

biking.

Q:    You know then that Barbara Monaco says that you were friends in 1998 to 1999, correct?

A:    Yeah.

Q:    And you disagree with that?

A:    Yes.

Q:    How is it that you recall that it was 2000 and 2001 when you were friends with Barbara Monaco?

A:    'Cause I was in, like, activities in those days.  I was very young.  And I remember when we started BMX that's when we started actually hanging out every day.

Q:    So it's your testimony that you weren't really friends with Barbara Monaco until you started BMX?

A:    Yeah.

(Tr. 1139).  Gina Green testified that she never went to Coney Island with Barbara

Monaco before 2000, and never went there with Barbara when Gina was six or

seven. (Tr. 1140).

The prosecution recognized the damage posed by Gina's testimony.   The

prosecutor argued:

This witness [Gina Green] has testified with respect to time frame . . . which contradicts the other witnesses in the case that say the crimes and these incidents of friendship had occurred between 1998 and 2003.   So the timeline has been effectively damaged in that each of the other witnesses

13

and their credibility is certainly at issue and they have all said that the 1998 to 2000 time frame they were friends with Gina.

(Tr. 1126-1127).

### C. The Coney Island Photograph: "The One Piece Of Evidence In The Whole Case That Is Not Capable Of Lying"[9]

To rebut Gina's testimony disputing Barbara's timeline, the prosecution called Gina's mother, **Cindy Green**.[10] (Tr. 1171-1172). The testimony of Cindy Green, Petitioner's former daughter-in-law, was the briefest of the People's witnesses and by far the most devastating. The prosecutor showed Cindy a souvenir Polaroid photo, depicting a laughing Gina Green and Barbara Monaco sitting in a giant chair with a huge, plastic bottle of beer. (Tr. 1173-1175) (People's Exhibit 32 at trial)[hereinafter "the Coney Island photograph"]. A full reproduction of People's Exhibit 32 is annexed hereto as Exhibit H.

People's Exhibit 32 at trial was a novelty photograph, taken at an outdoor location. The photograph was contained in a souvenir jacket, which bore the imprint "6/98." (Tr. 1177-1178; see Exhibit H). Cindy testified that the photograph was taken in Coney Island. (Tr. 1175). Although Cindy Green was not

---

[9] Tr. 2419 (ADA Brown's summation).

[10] The § 440.10 court incorrectly identified Cindy Green as the "defendant's own daughter." (Decision and Order, Dec. 14, 2009, at 3). She was not. She was Petitioner's daughter-in-law, (Tr. 1172), who was in the process of an extremely bitter and hostile divorce from Petitioner's son. (Tr. 1197-1198). The Suffolk County Court's misstatement of the relationship was used to support another error, viz., that it was reasonable for the People to rely on Cindy Green's "authentication" of the photograph because of the close relationship she had with Petitioner.

14

present when the photograph was taken, and had no memory of the event depicted in the photograph, she identified her daughter as being "six [or] seven" years old, (Tr. 1174, 1192-1193), thereby corroborating Barbara's account that the two knew each other in 1998-1999, and suggesting (based on earlier testimony that Petitioner would take the girls to Coney Island) that they had a relationship with Petitioner during this time.  Cindy testified that she was certain of that time frame because her daughter's hair was long during that time. (Tr. 1175, 1176).[11]

The prosecutor took the matter one step further, eliciting the following testimony from Cindy with respect to the Coney Island photograph:

Q:   And I just direct your attention to the back of the folder that holds the picture, the white writing.

Q:   Ms. Green, do you see a date in the back of the picture printed on the covering?

A:   Mm-hmm.

Q:   What is that date?

A:   6/98.

(Tr. 1177-1178).  The prosecutor argued that not only could the photograph be dated by virtue of the length of Gina's hair, but also by the date stamp on the back of the folder in which the photograph was placed.

---

[11] Cindy Green denied that she provided the Coney Island photograph to the prosecution. (Tr. 1175-1176).  The defense never learned who did provide it, or what representations had been made with respect to it.

15

The Coney Island photograph was the first, and only, piece of independent physical evidence that appeared to serve as irrefutable proof that Barbara and Gina knew each other during the relevant time period.  And it appeared to be irrefutable proof that Petitioner's primary defense – that neither Petitioner nor Gina Green knew Barbara during the relevant time period – was untrue.  Unlike both the Halloween photograph and the Turbo Twist Speller, whose provenance was somewhat dependent upon the credibility of Barbara Monaco, the Coney Island photograph, with its "6/98" imprint on the jacket, coupled with the authentication by Gina's mother, was devastating and was unrebutted.

**Elizabeth Mulligan**, a volunteer with the Shoreham BMX, authenticated BMX records that showed Petitioner first enrolled young people in BMX racing in 2001. (Tr. 1485, 1490-1491, 1493).  Petitioner enrolled Gina on October 14, 2001, (Tr. 1493), and Barbara Monaco on December 2, 2001. (Tr. 1484-1485, 1491, 1493).

## III.    The Defense Case

In keeping with the defense assertion that the sexual abuse could not have happened because the girls did not know each other during the time periods when they claimed to have been molested, the defense called numerous members of the extended Green family to testify as to when Gina Green began to keep company with Barbara Monaco and Kerri Petersen.

**Paula Green**, Petitioner's niece by marriage, testified that she introduced Barbara to Petitioner in the summer of 2000. (Tr. 1624). Paula was good friends with Barbara Monaco and her mother, (Tr. 1619-1620), and she knew that Barbara and Gina did not know each other before she made the introduction. (Tr. 1626, 1656). On cross-examination, Paula Green was confronted with the Coney Island photograph. She repeatedly stated that she "can't see" the photo, but responded to the prosecution's prodding, testifying that Barbara looked like she was about five years old. (Tr. 1663, 1664). Paula was unable to identify Gina Green in the photograph, (Tr. 1663, 1664), and was likely unaware of the fact that her inaccurate estimate of Barbara's age directly contradicted her testimony that Barbara and Gina did not know each other before the summer of 2000.

**Patricia Green**, one of Petitioner's three adult daughters, testified that she resided in her parents' home in the winter of 1998-1999, (Tr. 1694), and did not meet Barbara until she moved out in June 2000. (Tr. 1697-1698). Patricia also testified that the swimming pool, which Barbara and Kerri insisted they swam in during the summers of 1998 and 1999, was inoperable in 1997-1999. (Tr. 1686-1687, 1689). She authenticated numerous photographs of the Green swimming pool, depicting a pool that was inoperable. (Tr. 1687-1689).

**Joanne Green**, Petitioner's wife, testified that the pool was inoperable in 1997-1999 because they were without funds to fix the lining. (Tr. 1781-1782,

17

1807-1809, 1811).  The pool finally became operable around 2001, according to her recollection. (Tr. 1807).  She did not recall the year when she first met Barbara and her mother, but it was when their financial situation started to improve, sometime around 2000. (Tr. 1782-1784).

**Josephine Adams**, another of Petitioner's adult daughters, testified that she lived at Petitioner's house in the summer of 1998, (Tr. 1836-1837), and did not know Barbara or see her at Petitioner's house that summer. (Tr. 1839-1840). During that summer, the swimming pool was "like a swamp." (Tr. 1839).  The pool became operable in 2000. (Tr. 1851).  Josephine was shown the Coney Island photograph, and testified that Gina looked "about eight" years old in the photograph. (Tr. 1847).

**Annmarie Castelli**, the last of Petitioner's daughters, testified that the swimming pool was not operating in 1997-1999, (Tr. 2010), and that she first met Barbara during the summer of 2000. (Tr. 2043).

While the defense tried to rebut Barbara's and Kerri's timeline through the testimony of multiple witnesses, at trial the defense lacked any physical evidence to impeach the physical evidence offered by the People that purportedly documented the relationship with Barbara and Gina during the years 1998-1999.

**Rosann Billotto**, a neighbor of Barbara Monaco, testified that Barbara had a reputation for being untruthful. (Tr. 1991-1992).

18

**Thomas Mayer,** the district manager of the local Blockbuster Video, testified that Petitioner's Blockbuster card was issued on September 1, 2000. (Tr. 1969). Such testimony seemed to undercut Barbara's account of going to Blockbuster and Petitioner renting a movie for them on the night of her alleged molestation.

**Petitioner** took the stand in his own defense. He adamantly denied that any abuse, or any sexual contact of any kind, had ever taken place. (Tr. 2125, 2134). He testified that Gina and Barbara began to sleep over at his house "[w]hen we started to BMX, because we had to leave early Sunday morning to be at BMX." (Tr. 2095). The BMX racing began in 2001. (Tr. 2087). He, too, testified that he did not know Barbara or Kerri before 2000. (Tr. 2124-25, 2128, 2207). Petitioner first met Barbara when she and her mother stopped by during the summer of 2000, once the pool was open. (Tr. 2089-91). He not only denied molesting Kerri Petersen, he denied ever taking her to Carvel ice cream alone. (Tr. 2125-2126). On re-cross examination, the prosecution made significant inquiry to illustrate that there were no dates on the backs of the pictures entered into evidence on behalf of Petitioner. (Tr. 2268-2270).

## IV.   **Rebuttal**

The prosecution re-called Thomas Mayer, who testified that another Blockbuster card had been issued in the name Thomas Green (the name   of

Petitioner's son) at 248 Magnolia Drive, Selden, New York in 1994, (Tr. 2280-2281), and showed Cindy (Petitioner's former daughter-in-law) as an authorized user. (Tr. 2281-2282, 2286-2287).

## V.   **Summations**

Both sides argued that the central issue at trial was whether Petitioner and his granddaughter Gina even knew the accusers in 1998 and 1999, when the alleged abuse took place, or whether the accusers and Gina met after 1999 and started to spend time together then.

Not surprisingly, the Coney Island photograph took center stage for the People.   In summation, the prosecution reiterated the timeline presented by Barbara, and highlighted the reliability of the Coney Island photograph as physical evidence of Barbara's narrative:

> Ladies and gentlemen, there is one piece of evidence that the defense can't get around in this case, although he tried.  This photograph of Gina and Barbara in a chair at Coney Island, testified to by Gina's mother, Cindy Green.  With a date on the back of June of 1998.  Take it in the back and look at it.  And compare the way in which Gina looks in this photograph to the defense exhibits that the family historian Annemarie Castelli entered into evidence.  There is no date on the back of this photo, but there is a date on the jacket that it came in.  The only date that exists on the back of the defense photos, of Gina, with all different hairstyles, it's one date.  Nick's christening, July of 2000.

(Tr. 2416-2417).  The prosecutor asserted that this was "the one piece of evidence in the whole case that is not capable of lying, and it puts Gina and Barbara together

at the time frame that Barbara tells you, around 1998 when Barbara is seven and Gina is six." (Tr. 2419).  The prosecutor argued:

> Josephine Adams came before you and tried to suggest, or stated to you, that Gina was eight in this photograph.   That should be an insult to your intelligence. At any point in time, during this trial, if you are at all confused about Barbara Monaco and her time line, this exhibit, People's 32, should take her out of the middle of the pile of confusion and put her at the top of crystal clear evidence.  The date is on the back.  No one hand wrote it.  It's here and the defense can't get out from under it.

(Tr. 2419).  Without question, the Coney Island photograph was the single most important piece of evidence in the case.

In summation, the prosecution also emphasized the centrality of the Halloween photograph as physical evidence corroborating Barbara's narrative of events:

> People's 18 is in evidence. Barbara Monaco testified about her and Gina going trick or treating.  Barbara said she was seven.  And so, at Halloween time, Gina would have been five, almost six.

(Tr. 2418).

In addition to the bolstering effect of the physical evidence, Barbara's testimony and Kerri's testimony worked in tandem to corroborate each other.  As the prosecutor argued in her summation:  "Kerri and Barbara both told you they were around 6, 7 years old when they met Gina, and each – and met each other soon after that.  That is some time around 1998." (Tr. 2377).  "Kerri told you she had been spending time with Gina and the defendant since she was 7 or 8 years

21

old.  She testified that she was there almost every weekend, starting in 1998 or so."

(Tr. 2388).  The prosecutor explained:

> And why was such a big deal made about the time frame?  Because members of the jury, if you believe the girls and you believe Barbara and Kerri that they did spend time at the defendant's home in 1998 and 1999, well, that evidence sinks him.

(Tr. 2398).[12]

## VI.   Verdict & Sentence

On August 21, 2008, Petitioner was convicted of two counts of first-degree sodomy against alleged victim Barbara Monaco, one count of attempted sodomy in the first degree against Gina Green, one count each of first-degree and second-degree sexual abuse against Barbara Monaco in the summer of 2003, and one count each of first-degree and second-degree sexual abuse against Kerri Petersen in the summer of 2003.  He was immediately remanded, and was sentenced to an aggregate prison term of 35 years on July 16, 2009.

## VII.   The Post-Trial Investigation

Immediately after Thomas Green's conviction, and well before his sentencing, new counsel, assisted by the same investigator retained by trial counsel, conducted a basic investigation, with startling results.

---

[12] Similarly, if the jury disbelieved Kerri Petersen regarding this most fundamental fact, it is unlikely that they would credit her account of her own alleged molestation.

## A. The Coney Island Photograph

The prosecutor was correct; the Coney Island photograph "is not capable of lying." However, this piece of evidence does not indicate that the photograph was taken in June 1998, as the prosecutor argued. In fact, easily available evidence establishes affirmatively that this photograph was taken **after June 21, 2000**—the date on which the film was manufactured.

While the prosecutor misled the jury by focusing their attention on the date of production of the sleeve in which the Polaroid was placed,[13] the Polaroid picture itself contains a serial number: "06017221343-02 1512 0210." (Exhibit H, full reproduction of People's Ex. 32, with an enlarged copy of the serial number on the reverse of the photograph). Defense counsel had never seen People's Exhibit 32 before it was produced in court, and was clearly taken by surprise by the photograph. (See Tr. 2035-2036).

After trial, Petitioner was able to identify affirmatively what those numbers mean. According to Polaroid Corporation, the numbers on the reverse of Exhibit 32 are known as a "frame code." (Exhibit I, Letter from Marianne Dilman,

---

[13] Defendant's trial counsel attempted, unsuccessfully, to clarify for the jury that the date, "6/98," was printed on the back of the sleeve in which the photo was placed, not on the back of the photo itself. "Ms. Brown may have gotten up here and said that the back of this card—not on the photo, but on the back of the card, is printed 6/98. She will submit to you this picture was taken in '98." (Tr. 2360).

Polaroid Corporation, dated Nov. 4, 2008).  Polaroid explains the meaning of these numbers as follows:

| **06** | **0** | **17** | **2 21 343** | - | **02** | **1512 0210** |
|---|---|---|---|---|---|---|
| *(1)* | *(2)* | *(3)* | *(4)    (5)* | | *(6)* | *(7)* |

(1)      Month of Manufacture.  The number "06" indicates that this film was manufactured in the month of June.

(2)      Year of Manufacture.  The number "0" indicates that this film was manufactured in the year 2000.

(3)      Assembly Machine Number.

(4)      Shift/Day Production

(5)      Film Lot Identification Number

(6)      Prototype Identifier

(7)      Time Sequence (military time) / Sequence Number In Frames

According to Polaroid's manufacturing records, "film lot #343 was manufactured on June 21, 2000 on assembly machine #17 at our Waltham Massachusetts facility and is one of Spectra Format film." (Exhibit I).

Had this information been presented at trial, it would have eviscerated the testimony of Cindy Green and Barbara Monaco, destroyed the prosecution's ability to rely on the photograph as the one piece of evidence that conclusively proves that the two girls knew each other in 1998, bolstered the testimony of Petitioner's

24

daughter, Josephine Adams (the prosecutor claimed that the photograph proved Adams' testimony was an "insult" to the jury's intelligence), and proved that the keystone of the prosecution's case was fraudulent.

Indeed, had this evidence been presented at trial, Cindy Green's testimony would have changed dramatically during cross-examination. After the trial, Cindy was shown People's 32 again, this time accompanied by the Dilman letter. Cindy then averred that the reason she testified the photograph was taken in 1998 "was that the jacket the photo was held in states that it was 'printed in 6/98.'" (Exhibit J, Affidavit of Cindy Green, January 17, 2009). Cindy went on to aver that, when she testified about the age of Gina in the photo, she "took a guess as to her age." (Exhibit J). After reviewing the Dilman letter, Cindy acknowledged under oath, "it is clear to me that People's Exhibit 32 was taken <u>after</u> June 21, 2000." (Exhibit J) (emphasis in original).

Had trial counsel conducted the necessary investigation, the prosecutor's "crystal clear evidence" would have established a timeline that directly contradicted the purpose for which it was offered.

**B. The Halloween Photograph**

An investigation performed after trial also affirmatively established that the Halloween photograph was not taken in 1998. While People's Exhibit 18 is indeed a photograph of Barbara and Gina on Halloween, and the girls may even have been

25

on Mr. Green's porch, it was demonstrably not taken during the relevant time period.  In the photograph, Barbara is clearly shown wearing a garment containing the trademark "Princess University." (Exhibit G).  "Princess University" is a registered trademark of EFX Marketing LLC, a New York entity, and is specifically registered for use on "women's clothing" like the kind depicted in People's Exhibit 18. (Exhibit K, Trademark, Principal Register, Princess University, United States Patent and Trademark Office, Reg. No. 2,692,342). According to the sworn documents filed with the United States Patent and Trademark Office, the very first time anything bearing the "Princess University" mark first entered commerce was on **July 5, 2001**. (Exhibit K).  As such, even if Barbara Monaco's sweater was the very first item printed bearing the "Princess University" trademark and Barbara Monaco was the very first person to purchase the very first such sweater on the very first day it entered commerce, the earliest possible date she could have acquired that item was July 5, 2001—**close to three years after she claims the picture of her and Gina was snapped.**

Quite simply, People's Exhibit 18 was not what the People claimed it to be. Indeed, it stands for the opposite proposition for which the prosecution offered it at trial.  The U.S. Patent and Trademark evidence, had it been used at trial, would have eviscerated the testimony of Barbara Monaco and Cindy Green, cast doubt on the testimony of Kerri Petersen, and demonstrated the truthfulness of the testimony

26

of prosecution witness Gina, as well as the defense witnesses and the Petitioner, who averred that the girls did not know each other during the relevant time frame. The Patent Office documents do not lie. The Patent Office has no motive to falsify, and no stake in the outcome of this litigation.

As demonstrated in the Affirmation of David Pressman, this information was easily available to defense counsel, or anyone else, at the time of trial. (Exhibit L, Affirmation of David Pressman, Dec. 21, 2008).[14]

### C. The Turbo Twist Speller

Likewise, evidence available at the time of trial, but not pursued by defense counsel, affirmatively disproves Barbara's testimony and further corroborates the defense contention that the relationship between the two girls commenced after the period when the alleged molestation took place. The manufacturers of the Turbo Twist device, in papers filed with the United States Patent and Trademark Office,

---

[14]There was additional evidence available to defense counsel to disprove the authenticity of the "Halloween 1998" photograph. Thomas Green, Jr., the son of Petitioner and father of alleged victim Gina Green, has submitted an affidavit with additional, irrefutable proof that the Halloween photograph was not what it was attested to be, including a photographic, documentary timeline proving that the Halloween photograph was taken in 2001. (Exhibit M, Affidavit of Thomas Green, Jr.). Thomas Jr. was never interviewed by trial counsel, although his name was placed on the witness list. Trial counsel made a decision not to call him as a witness because he was "too angry." (Exhibit M, at ¶ 2). Trial counsel never inquired of Thomas Jr. whether he had photographs and other evidence that could accurately date People's Exhibit 18. Trial counsel never showed Thomas Jr. People's Exhibit 18. Had trial counsel made the appropriate inquiries, the physical evidence could have been obtained from Thomas Jr., and trial counsel could have elected to examine him only on this point. Even without calling Thomas Jr., the photographs he could have provided would have been admissible through Cindy Green, the prosecution's witness. But trial counsel did not conduct the necessary investigation.

27

affirmatively state that the date that product first entered commerce was **August 25, 2000**. (Exhibit N, United States Patent and Trademark Office, Reg. No 2,34,765, Trademark, Principal register, "Turbo Twist," Scott Baldwin, Examining Attorney).  If Petitioner purchased the very first Turbo Twist on the very first day it entered the marketplace and that same day gave the gift to Barbara, that date could be no earlier than August 25, 2000, not 1998-1999.  Again, there was no possible strategic or tactical reason for defense counsel to refrain from obtaining and using this data.  As demonstrated in the Affirmation of David Pressman, (Exhibit L), the information was easily available from the Patent and Trademark Office.

### D. Law & Order: Special Victims Unit

Barbara claimed that the reason she did not come forward immediately after the alleged molestation was that she had seen Law & Order: Special Victims Unit [hereinafter "Law & Order: SVU"]—a television program that deals with the investigation and prosecution of sex abuse cases—and learned from the program that it was often difficult for victims to testify in court. (Tr. 710-712).

However, Law & Order: SVU had not even aired during this time period.  A simple internet search would have revealed that the first episode of Law & Order: SVU aired on **September 20, 1999**. (Exhibit O).  Through the simple expedient of a subpoena, the accuracy of this internet information would have (and has) been

28

confirmed by NBC. (Exhibit O).  Thus, even if Barbara Monaco had watched the very first episode of Law & Order: SVU, and this very first episode involved the badgering of a child witness (which it apparently did not), the first time she could have learned about the difficulties of testifying was September 20, 1999—many months after she claimed she was molested and failed to report it based upon her viewing of a program that had not yet aired.

Sadly, and again, this information was readily available to defense counsel. There was no conceivable strategic or tactical reason for failing to obtain it.  Had the evidence been obtained, it would have eviscerated Barbara Monaco's testimony with respect to the crucial issue of why she did not make a complaint at the time of the alleged molestation or for five years thereafter.

## CLAIMS FOR RELIEF

FOR A FIRST CLAIM FOR RELIEF:

TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO INVESTIGATE THE PROSECUTION'S CRUCIAL PHYSICAL EVIDENCE, WHICH CORROBORATED THE TIMELINE PROVIDED BY KEY PROSECUTION WITNESSES AND UNDERMINED PETITIONER'S CORE DEFENSE THAT HE DID NOT KNOW THE ACCUSERS AT THE TIME THE CRIMES WERE ALLEGED TO HAVE OCCURRED.  SUCH AN INVESTIGATION WOULD HAVE AFFIRMATIVELY ESTABLISHED THAT THE PROSECUTION'S EVIDENCE WAS FALSE, AND WOULD HAVE BOLSTERED PETITIONER'S DEFENSE.

## A.   Statement Of Relevant Facts

> *"And why was such a big deal made about the time frame?   Because members of the jury, if you believe the girls and you believe Barbara and Kerri that they did spend time at the defendant's home in 1998 and 1999, well, that evidence sinks him."*

>                                   --Summation of ADA Brown, August 19, 2008 (Tr. 2398).

The crux of the prosecution was the credibility of the four accusers, two of whom were disbelieved *in toto* and two of whom were believed only because of three pieces of physical evidence that appeared to corroborate their account that they knew the petitioner in 1998 and 1999.  The first was a Polaroid photograph of Gina Green and Barbara Monaco taken at Coney Island (Exhibit H, People's Ex. 32 at trial).   Cindy Green, Petitioner's daughter-in-law,[15] testified that the photograph was taken in the summer of 1998.  The re-useable jacket that contained the photograph had a printed date of "6/98."

In summation, the prosecutor asserted that this was the "one piece of evidence that the defense can't get around in this case" and the "one piece of evidence in the whole case that is not capable of lying, and it puts Gina and Barbara together at the time frame that Barbara tells you, around 1998 when Barbara is seven and Gina is six."  The prosecutor instructed the jury:

---

[15] The Suffolk County Court, in denying Petitioner's § 440.10 motion, incorrectly found that this was the testimony of "the defendant's own daughter." (Exhibit C, Decision and Order, Dec. 14, 2009, at 3).

> At any point in time, during this trial, if you are at all confused about Barbara Monaco and her time line, this exhibit, People's 32, should take her out of the middle of the pile of confusion and put her at the top of crystal clear evidence. The date is on the back. No one hand wrote it. It's here and the defense can't get out from under it.

(Tr. 2419).   Without question, the Coney Island photograph was the single most important piece of evidence in the case.

The second piece of physical evidence was a photograph of Gina Green and Barbara Monaco together, dressed up in Halloween costumes. (Exhibit G, People's Ex. 18 at trial).   Barbara testified that this photograph was taken "[o]n Mr. Green's front porch, on his lawn" when Barbara was "seven" years old. (Tr. 516-517).   In summation, the prosecution emphasized that this photograph also corroborated Barbara's account of the timelines, arguing "Barbara Monaco testified about her and Gina going trick or treating.   Barbara said she was seven.   And so, at Halloween time, Gina would have been five, almost six." (Tr. 2418).

The third piece of physical evidence was a device known as a "Turbo Twist Speller," a learning tool for those having difficulty spelling.   Barbara testified that Thomas Green had given it to her when "I started failing school...for spelling" which was in "third grade." (Tr. 580).   Barbara was in the "third grade" in 1999. (Tr. 521).

Lastly, an extraordinary amount of time had passed between the alleged molestation in late 1998/early 1999, and Barbara's first mentioning of it more than

31

seven years later, in November of 2006. To explain this delay, Barbara testified that she did not report the molestation because she had seen an episode of Law & Order: SVU which depicted how difficult it was for children to testify. She said that she did not think she was able to go through with that at the time of the molestation. (Tr. 710-712).

Defense counsel never conducted even the most rudimentary investigation into the authenticity of any of these items of physical evidence, nor did he investigate Barbara's claim regarding Law & Order: SVU. He had no strategic or tactical reason for failing to do so. He had an investigator on retainer to whom he did not assign any of these matters.

The Coney Island photograph had a serial number on the photograph itself. (See Exhibit H). A telephone call to Polaroid Corporation revealed that the serial number, known as a "frame code," contains information regarding the manufacture of the film, including the date the film was manufactured. According to an affidavit from a Polaroid Corporation official, the film on which the Coney Island photograph was taken **was made on June 21, 2000.** (See Exhibit I). The photograph, therefore, could not have been taken in June of 1998, as the prosecutor argued and as Cindy Green incorrectly attested. Indeed, it was evidence not capable of lying—but the same cannot be said of the prosecutor who proffered it. When Cindy Green, who "authenticated" the photograph for the prosecutor, was

32

confronted with the frame code information, she recanted her identification, admitting under oath that she "took a guess as to her age" when she testified at trial.

The Halloween photograph depicts Barbara wearing a garment containing the trademark "Princess University." (See Exhibit G). A brief check of the United States Patent and Trademark Office demonstrated that the very first time anything bearing the "Princess University" mark first entered commerce was on **July 5, 2001**. (See Exhibit K). A similar check shows that the Turbo Twist Speller could not have been given to Barbara in 1999 because it did not enter commerce until **August 25, 2000**. (See Exhibit N).

Thus, every piece of physical evidence that purported to establish a relationship between Barbara and Gina in 1998-1999, including the one piece of evidence not capable of lying, established that the relationship did not begin until after 2000.

Lastly, Barbara's claim that she did not come forward immediately because of her experience with Law & Order: SVU was similarly shown to be a lie. A quick internet search revealed that the show first aired on **September 20, 1999**, many months **after** Barbara's alleged molestation. (See Exhibit O).

All of these facts were duly attested to and authenticated by new counsel, and submitted to the Suffolk County Court as part of a motion to vacate the

33

conviction pursuant to New York Criminal Procedure Law § 440.10. The motion alleged ineffective assistance of counsel under both the United States Constitution and the Constitution of the State of New York, and a violation of due process based upon the use of the fraudulent evidence and the allegation that, at the very least, the prosecutor should have known that the evidence was fraudulent.

The Suffolk County Court denied the motion in its entirety. Ignoring the federal constitutional standard, the court ruled that defense counsel's representation had been "meaningful" because of his skilled cross-examination and that the evidence uncovered by new counsel would not "have resulted in defendant's complete acquittal." (Exhibit C, Decision and Order, Dec. 14, 2009, at 3).

Petitioner applied for leave to appeal the decision to the Appellate Division, Second Department. The application was denied on April 7, 2010. (Exhibit D).

**B.   Defense Counsel's Failure To Investigate**

There was no conceivable strategic or tactical reason for trial counsel's failure to obtain the documentation regarding the Coney Island photograph, the Halloween photograph, the Turbo Twist Speller, or the Law & Order: SVU episodes. Trial counsel, Paul Gianelli, submitted an affirmation in which he acknowledges that he had no strategic reason for his failure to investigate, and that obtaining the evidence contained herein "would have proved indispensable in

34

presenting our defense and discrediting the People's witnesses." (Exhibit P, Affirmation of Paul Gianelli, dated January 26, 2009).   Indeed, in adjudicating Petitioner's § 440 motion, the Suffolk County Court did not find that his failures were a result of strategy.[16]

The investigation conducted post-verdict was not difficult or unusual; it required no specialized skills or advanced expertise.   It would not have entailed great expense or a lengthy commitment of time.

**C.**    **Argument:  Trial Counsel's Failure To Investigate And Challenge The Most Significant Corroborative Evidence Of The Complainants' Story Deprived Petitioner Of The Effective Assistance Of Counsel, And It Was An Unreasonable Application Of *Strickland* For The County Court To Hold Otherwise.**

The Suffolk County Court's denial of Petitioner's motion under CPL § 440.10 on the grounds that Petitioner's "constitutional right to the effective assistance of counsel has been satisfied" constitutes an adjudication on the merits for purposes of 28 U.S.C. § 2254(d)(1); see Henry v. Poole, 409 F.3d 48, 61 (2d

---

[16] This failure to investigate is even more baffling in light of the fact that the defense had retained a licensed private investigator, Jay Salpeter, in February, 2007. (Exhibit Q, Affidavit of Jay Salpeter, January 17, 2009, at ¶ 2). For reasons that are unexplained and inexplicable, trial counsel severed all contact with Mr. Salpeter in or around April, 2008. (Exhibit Q, at ¶ 3). Mr. Salpeter was not informed that the trial was scheduled to begin until he received a telephone call from Petitioner, informing him that trial was to begin the next day. (Exhibit Q, at ¶ 4). However, he did not receive any communications from defense counsel, or any direction as to what, if anything, he was supposed to do. He heard of Petitioner's conviction through media reports. (Exhibit Q at ¶ 5-7). Mr. Salpeter did not see People's Exhibits 18, 20, and 32 until after the trial when he was contacted by new defense counsel. (Exhibit Q, at ¶ 8, 14). Mr. Salpeter avers that had he been given access to the evidence during trial, he would have been able to obtain the documentary evidence included herein within 24 hours. (Exhibit Q at ¶ 10-13).

Cir. 2005), cert denied, 547 U.S. 1040 (2006). Thus, Petitioner may obtain relief under the deferential standard of the Antiterrorism and Effective Death Penalty Act ("AEDPA") if the county court's decision "involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see Harris v. Kuhlmann, 346 F.3d 330, 342 (2d Cir. 2003).

As to Petitioner's ineffective assistance claim, the proper question is whether the county court unreasonably applied Strickland v. Washington, 466 U.S. 668 (1984). See Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005), citing Williams v. Taylor, 529 U.S. 362, 390 (2000). To be "unreasonable," the county court's application of Strickland must "reflect some increment of incorrectness beyond error, although that increment need not be great." Gersten, 426 F.3d at 607 (internal quotations omitted), cert denied, 547 U.S. 1191 (2006). That requirement has been satisfied here.

The standard articulated in Strickland requires a showing that the attorney's performance was deficient under prevailing standards of professional norms, and that, but for this deficiency, there was a "reasonable probability" that the outcome would have been different. Strickland, 466 U.S. at 694.

In adjudicating Petitioner's § 440 motion, the Suffolk County Court ignored the federal constitutional standard for evaluating Petitioner's Sixth Amendment

36

claim.[17]  The county court did not pass on whether trial counsel's utter failure to engage in the most basic investigation of the most important pieces of physical evidence was conduct which fell below the prevailing professional norms, finding only that trial counsel "engaged in skillful cross-examination." (Exhibit C, Decision and Order, Dec. 14, 2009, at 3).  While trial counsel may well be skilled in the technique of cross-examination, his skill cannot compensate for his failure to obtain the evidence that would have permitted a successful cross-examination, as well as a meaningful defense.

The county court also applied a manifestly wrong standard for prejudice.  In denying Petitioner's motion to vacate, the trial court ruled that a proper investigation, and the discovery of the fraudulent nature of the prosecution's evidence, "would have been beneficial to defendant" but would not "have resulted in defendant's complete acquittal." (Exhibit C, at 3).  As discussed below, the prejudice prong of Strickland does not require that the defendant prove that each and every charge for each and every victim would have been changed from guilty to not guilty.  All that is necessary is a reasonable probability that at least one

---

[17] The New York Court of Appeals has consistently refused to adopt the federal standard, leading to New York's federal courts granting habeas corpus relief on Sixth Amendment grounds where the New York State Court of Appeals has denied such relief on state and federal constitutional grounds. See Henry v. Poole, 409 F.3d 48 (2d Cir. 2005) (granting habeas corpus petition, finding Court of Appeals engaged in an "unreasonable application" of federal law; dicta suggesting that New York State standard is "contrary to" federal law), cert denied, 547 U.S. 1040 (2006).

count of conviction would have resulted in something other than guilty. The county court made no reference to the "reasonable probability" standard, nor did the court provide any indication as to what standard of review it was applying, other than declaring "it cannot be said" that the absence of counsel's error "would have resulted in defendant's complete acquittal." (Exhibit C, at 3). As discussed at length below, in rejecting Petitioner's ineffective assistance claim, the county court unreasonably applied Strickland.

## 1. Professional Dereliction is Established

Effective legal assistance is essential to the "legitimacy[] of our adversary process." Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). The aim of the Sixth Amendment's effective assistance guarantee is to "ensure that defendants have a fair opportunity to contest the charges against them." Id. at 393 (Powell, J., concurring). In this case, the Suffolk County Court looked only at the things that trial counsel did correctly, finding that his skilled cross-examination provided "meaningful representation." Yet, trial counsel's failure to investigate the prosecution's evidence deprived Petitioner of the opportunity to effectively challenge the key physical evidence corroborating the stories of the complainants.

There can be no doubt that the Coney Island photograph and the Halloween photograph were determinative in establishing the relationship among Gina Green, Barbara Monaco, and Kerri Petersen in 1998. Indeed, as noted earlier, the

38

prosecutor touted the Coney Island photograph as "the one piece of evidence in the case that is not capable of lying." (Tr. 2419). Once the jury accepted the accuracy of the photographs as depicting events in 1998, in the words of the prosecutor, "that evidence sinks" Petitioner. (Tr. 2398). Indeed it did.

Moreover, the false explanation given by Barbara Monaco as to why she did not come forward earlier was extremely credible in the absence of proof that it could not have been true. And the introduction of the Turbo Twist Speller further helped to establish a relationship between Barbara Monaco and Petitioner in 1999, notwithstanding the fact that we now know, and the jury should have learned, that the device had not been manufactured until August 25, 2000. Instead of addressing what trial counsel failed to do, and the prejudice that ensued from these failures, the Suffolk County Court lauded trial counsel's skillful cross-examination. While some of trial counsel's representation of Petitioner was skillful, the failure to obtain easily available proof that the keystones of the prosecution's case were fraudulent deprived Petitioner of the right to effective assistance of counsel.

An attorney's conduct is constitutionally deficient if, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Under the Sixth Amendment, "counsel has a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691.

Although "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," (Id. at 690), the errors of trial counsel in this case were clearly not strategic, as admitted by trial counsel himself. Trial counsel's failure to perform the rudimentary investigation that would have disclosed the falsity of the prosecution's evidence is "not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client that federal courts have denominated 'strategic' and been especially reluctant to disturb." Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001) (collecting cases concerning "conscious" decisions, "reasonably informed" decisions, and "decisions made with an eye to helping a client"). Thus, the deference given to an attorney's "strategic" decisions is inapplicable in this case. See Id. at 217.

The reasonableness of an investigation, or a failure to investigate, is dependent upon the facts of a case, but common factors pertinent to the reasonableness analysis can be gleaned from federal case law, including: whether counsel was aware of any facts or discrepancies that put him on notice of the potential benefits of pursuing a line of investigation, (see, e.g., Pavel, 261 F.3d at 224-25 [holding that a reasonably professional attorney on notice of an

40

inconsistency in the evidence "would not have sat on his hands," but pursued the line of investigation]), and the availability of the information which counsel failed to obtain. See Greiner v. Wells, 417 F.3d 305, 322 (2d Cir. 2005) (collecting cases and noting, "[i]n nearly every case that concludes that counsel conducted a constitutionally deficient investigation, the courts point to readily available evidence neglected by counsel"); Rompilla v. Beard, 545 U.S. 374, 377 (2005) (emphasizing that the "unreasonableness of attempting no more than [counsel] did was heightened by the easy availability of the file"); Hart v. Gomez, 174 F.3d 1067, 1070-71 (9th Cir. 1999) ("[h]aving chosen to pursue [a particular] line of defense," counsel's failure to introduce readily-available evidence that would have corroborated that defense contributed to a finding of ineffective assistance of counsel).

Here, counsel was on notice of the inconsistencies in the prosecution's dates; it formed the crux of the defense. Petitioner, himself, and alleged victim Gina Green maintained that they did not know the accusers during the 1998-1999 time period in which the abuse was alleged to have occurred. Furthermore, as established by the affidavits of David Pressman and Jay Salpeter, the information that would have affirmatively established the falsity of the dates provided for the crucial evidence corroborating the complainants' time line was easily obtainable.

41

(See Exhibit L, Affirmation of David Pressman, Dec. 21, 2008; Exhibit Q, Affidavit of Jay Salpeter, Jan. 17, 2009).

The Second Circuit's decision in Lindstadt v. Keane, 239 F.3d 191 (2d Cir. 2001), supports the conclusion that a reasonably competent attorney, in a sexual abuse case such as this, would have conducted the rudimentary investigation of the complainants' timeline that would have uncovered the evidence now at issue. Evaluating an ineffective assistance claim involving an attorney's failure to conduct an investigation that would have established that the prosecution's dating of the charged crimes was erroneous, the Lindstadt court announced:

> Defense counsel investigating a case of child molestation should be expected to ascertain the child's age at the time of the event, to consider the [sic] how many years elapsed before the trial testimony, to read the child's prior statements closely, and to check school performance for signs of psychological trauma.  These elementary steps would have uncovered the prosecution's error.

Id. at 201.  Likewise, the simple process of investigating the dates alleged by the complainants, and the physical evidence introduced by prosecution to support those dates, would have uncovered the true nature of the falsified evidence in this case, and is conduct that would be expected of a reasonably competent attorney representing a defendant in a sex abuse case.

In Gersten v. Senkowski, 299 F.Supp.2d 84 (E.D.N.Y. 2004) (Weinstein, J.), aff'd, 426 F.3d 588 (2d Cir. 2005), cert denied, 547 U.S. 1191 (2006), this Court

42

noted that special skills were required to defend against accusations of intra-family child rape:

> Since such cases frequently hinge on the credibility of the child, the Court of Appeals for the Second Circuit has declared that "defense counsel is obliged, wherever possible, to elucidate any inconsistencies in the complainant's testimony, protect the defendant's credibility, and attack vigorously the reliability of any physical evidence of sexual contact between the defendant and the complainant."

Id. at 91, quoting Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003). In Gersten, the failure of defense counsel to consult with medical experts, or to call them at trial, constituted ineffective assistance of counsel, even though it was the result of a strategic choice by defense counsel. Id. at 100 (reasoning "[w]here counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court will usually conclude that the decision not to call an expert cannot have been based on strategic considerations . . . .").

In Petitioner's case, the dereliction of counsel was greater. It takes no heavy lifting to turn over People's Exhibit 32, discover a serial number, and contact Polaroid, especially when the numbers on the reverse look as though they are date codes. It requires no special expertise, or brilliance, to do a quick internet search for Patent Office documents with respect to "Princess University" and the Turbo Twist Speller, especially when counsel is trying to accurately date these items. And finding the date of the first airing of Law & Order: SVU takes only seconds.

43

Counsel spent substantial time badgering Barbara about this issue, but failed utterly to obtain the one piece of evidence that would have impeached her.

The Second Circuit has repeatedly underscored the importance of effective representation, and thorough investigations, in cases involving allegations of sexual abuse. See, e.g., Pavel, 261 F.3d at 221 (acknowledging that many sexual abuse cases boil down to a "credibility contest," because "often it is only the child and the [alleged] abuser who know what transpired[]. In such cases, it should be perfectly obvious that it will almost always be useful for defense counsel to speak before trial with readily-available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes."). That proposition of law – that in a sexual abuse case the failure to investigate and introduce readily available evidence that may potentially buttress the defense's theory constitutes deficient performance – has been adopted, and thoroughly discussed, by other circuits too. See Williams v. Washington, 59 F.3d 673, 681-82 (7th Cir. 1995) (in case alleging sexual assault, counsel's failure to conduct investigation that would have uncovered information bolstering defendant's credibility and "indicat[ing] that, given the layout of the home ... the alleged assault could not have taken place as claimed" constituted ineffective assistance); Hart v. Gomez, 174 F.3d 1067, 1070-71 (9th Cir. 1999) (holding that failure to introduce evidence supporting defendant's contention that sexual abuse could not

44

have occurred under the circumstances alleged rendered counsel ineffective); Holsomback v. White, 133 F.3d 1382 (11th Cir. 2000) (finding counsel's failure to investigate the significance of the lack of medical evidence of sexual abuse constituted ineffective assistance because counsel knew the case would turn "entirely on whether the 'jury believe[d] the child," yet "he made no effort to support [the petitioner's] claim of innocence with disinterested . . . evidence suggesting that [the boy's] allegations were not credible"); Crisp v. Duckworth, 743 F.2d 580, 584 (7th Cir. 1984) ("Though there may be instances when the decision not to contact a potential defense witness is justified, an attorney who fails even to interview a readily available witness whose noncumulative testimony may potentially aid the defense should not be allowed automatically to defend his omission simply by raising the shield of 'trial strategy and tactics'").

Thus, it is well-settled that the unjustified failure to engage in reasonable investigation, when such investigation would have a reasonable chance of uncovering information useful to the defense, constitutes deficient representation. Here, there was more than a "reasonable chance," there was an outright certainty. And the county court itself held that a proper investigation would have uncovered evidence that "would have been beneficial to the defendant." Addressing such circumstances in Harris v. Artuz, 288 F.Supp.2d 247 (E.D.N.Y. 2003), aff'd, 100 Fed. Appx. 56 (2d Cir. 2004), this Court held:

Because no reasonable trial strategy could have been affected adversely by introducing this evidence, it seems exceedingly unlikely that trial counsel was even aware of it. His failure to make use of the [evidence] is otherwise beyond reasonable explanation. Even if it could be shown that defense counsel was aware of the documents, "the failure to introduce this evidence, without any plausible justification, appears to be a significant dereliction by the defense."

Id. at 260, quoting Eze, 321 F.3d at 126-27.

Even without the hindsight awareness of the favorable nature of this properly authenticated evidence, trial counsel's failure to investigate the prosecution's dating of the evidence was unreasonable. Suggesting that such an omission would be unreasonable regardless of the outcome of the investigation, the Second Circuit has acknowledged that, in sexual abuse cases, the failure to investigate the prosecution's evidence "is often indicative of ineffective assistance of counsel . . . particularly [] where the prosecution's case . . . rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony." Gersten, 426 F.3d at 607 (citations omitted).

Here, as in Gersten, the prosecution's case "rested centrally on the alleged victim's testimony and its corroboration by the indirect physical evidence." Id. at 608. Had counsel conducted the rudimentary investigation into the prosecution's physical evidence, counsel could have presented a strong case "that the charged crime[s] did not occur and the alleged victim's story was incredible in its entirety."

46

Id. As the physical evidence was the only neutral, disinterested evidence to corroborate the timeline of the complainants, it constituted the most extensive corroboration that any crime had occurred, and it significantly undermined the Petitioner's contention that the charged crimes could not have occurred because he didn't even know the accusers at that time. To prove that the dating of the evidence was false, would have not only buttressed Petitioner's core defense, it would have "undermine[d] the alleged victim[s'] credibility and thus the entire prosecution case as to all charges." Id.

Referencing the American Bar Association Standards for Criminal Justice, the Gersten court concluded that the attorney's failure to examine the prosecution's physical evidence "was a serious dereliction of his duty to investigate the facts and circumstances of petitioner's case." Id. at 609. Here, too, counsel's unjustified and inexplicable failure to investigate and introduce the true dates of the prosecution's crucial physical evidence defied the professional standards of reasonableness.

## 2. Prejudice

As mentioned *supra*, the Suffolk County Court applied the wrong legal standard in assessing whether Petitioner satisfied the prejudice prong of his Sixth Amendment claim. As to the egregious failure of trial counsel to conduct the most rudimentary investigation into the physical evidence, the county court found that had the investigation been conducted and the physical evidence obliterated,

47

Petitioner still had not proved that he would have been acquitted of every charge lodged by every complainant.  Because there was still sufficient evidence to convict Petitioner in the absence of the fraudulent physical evidence, the § 440.10 court held that Petitioner's "right to the effective assistance of counsel has been satisfied." (Decision and Order, Dec. 14, 2009, at 3).  The county court cited no case in support of its *ipse dixit* that, in order to show ineffective assistance of counsel, Petitioner must show that his attorney's conduct was so deficient that, had he acted properly, there would be an insufficient residuum of evidence to support a conviction on any charge.  That, of course, is not the legal standard.

To satisfy the "reasonable probability" prong, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Strickland, 466 U.S. at 693.  Rather, "the question that must be asked in assessing the prejudice from counsel's errors ... is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." Id. at 695.  Counsel's errors may render the result of a proceeding unreliable, even if they "cannot be shown by a preponderance of the evidence to have determined the outcome." Id.  Accordingly, the level of prejudice which Petitioner must demonstrate "lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" Lindstadt, 239 F.3d at 204, quoting Strickland, 466 U.S. at 693.  A

"reasonable probability" is one "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

An attorney's failure to investigate was found to have "undermine[d] confidence in the outcome" in Lindstadt, in which the Second Circuit reversed the decision of this Court and granted the writ of habeas corpus. 239 F.3d at 204. The petitioner in Lindstadt was accused of multiple counts of sexually abusing his nine year-old daughter on two occasions; one in December 1986, the second in April 1988. The defense's theory was that the sexual abuse had been fabricated by the defendant's wife. In a statement to the police, the child stated that the first incident occurred at their family home, located at 62 Fairfax Drive in Coram, when she was in first grade, around December 1986. Id. at 200. The indictment repeated that date and location, as did the child and her mother (defendant's wife) in their trial testimony. At some point after his conviction, the petitioner realized, and the prosecution conceded, that the first incident of alleged abuse could not have occurred in December 1986 because the family did not live at 62 Fairfax during December 1986, and the child was in first grade in December 1985, not December 1986. Subsequent to petitioner's conviction, the prosecution conceded that the abuse had to have occurred in December 1985. The petitioner challenged his conviction on ineffective assistance grounds based, *inter alia*, upon trial counsel's failure to investigate the dates of the alleged abuse and the failure to conduct an

49

investigation as to the research relied upon by the prosecution's expert. This court denied the petitioner's motion, finding that "[t]he testimony regarding what petitioner did lay at the heart of his conviction. Where and when he did it did not." Id. at 205.

> The Second Circuit disagreed, explaining:

> [A]side from the testimony of Dr. Gordon, the only evidence of abuse came from [defendant's] wife and daughter; their credibility lay at the heart of the prosecution's case. Had defense counsel mounted a proper challenge to their testimony as to where and when the abuse occurred, it would have naturally called into question whether the abuse occurred at all.

Id. Thus, the Second Circuit determined that the prejudice prong had been satisfied. See Lindstadt, 239 F.3d at 204-205 (reasoning, "There were only two people with any direct knowledge as to whether [the defendant] sexually abused his daughter. ...And Counsel's failure to investigate prevented an effective challenge to the credibility of the prosecution's only eyewitness, [defendant's] daughter"; and further noting that defendant's wife and the pediatrician were the only two witnesses "offered to corroborate the prosecution's account of the abuse . . . counsel's errors impaired his ability to mount an effective cross examination of these witnesses . . . allow[ing] the prosecution to dress up the weak and inconclusive physical evidence in the trappings of [the doctor's] expertise"), citing Williams, 59 F.3d at 682-685 ("Counsel's lack of familiarity with the case, combined with his failure to investigate, provided [the defendant] with a trial

significantly different than she might have received if represented by a competent attorney."); United States ex rel. Williams v. Brown, 721 F.2d 1115, 1120 (7th Cir. 1983) (holding that counsel's inadequate preparation for trial prejudiced the defendant); United States v. Tucker, 716 F.2d 576, 592-95 (9th Cir. 1983) (same); and Holsomback, 133 F.3d at 1388 (holding that, in a case turning on credibility, the failure to adequately investigate the physical evidence concerning whether sexual abuse occurred prejudiced the defendant); cf. Chatom v. White, 858 F.2d 1479, 1487 (11th Cir. 1988) (holding that failure to make warranted motion to exclude damaging circumstantial evidence prejudiced the defendant).

Like Lindstadt, Petitioner's case "is a case of underwhelming evidence," and turned upon the credibility of the complainants. Lindstadt, 239 F.3d at 205, citing Hart, 174 F.3d at 1072-73 (holding that, even with the defendant's confession to abusing child on previous occasions, there was not overwhelming evidence that defendant abused child on charged occasion).  The introduction of evidence from any creditable source that would have cast doubt on the complainants' testimony might have affected the outcome.  So, too, did trial counsel's failure in this case to investigate the authenticity of the People's evidence with respect to the crucial issue at trial constitute a similar deprivation.

51

Nevertheless, in Petitioner's case the county court determined that counsel provided effective representation, focusing on his cross-examination of the complainants and the People's other witnesses. The court stated:

> The issue of the credibility of the victims, present throughout the trial, was highlighted by trial counsel and specifically attacked on both cross-examination and through the testimony of defense witnesses. That attack was met, to some degree, with obvious success inasmuch as the defendant was acquitted of charges relating to two alleged victims.

(Exhibit C, at 3). Yet, counsel's "skilled cross-examination" was not sufficient to affirmatively establish that the testimony provided by the prosecution's witnesses as to the dates of the physical evidence were false; or to affirmatively establish that Barbara's reason for not disclosing the alleged abuser sooner could not have been true. However, the easily discoverable evidence obtained subsequent to trial not only affirmatively established those facts, but also undermined the credibility of the prosecution's witnesses, generally, Kerri and Barbara, more specifically, and provided significant support for Petitioner's contention that the charged crimes could not have occurred as alleged because Petitioner did not even know the accusers at that time.

The value of concrete evidence from a disinterested witness establishing that the circumstantial details in the complainants' testimony concerning the sexual assault were false, and corroborating the defense's theory, far surpasses the "attacks" on the credibility of the complainants accomplished by counsel's cross-

examinations. The Second Circuit has repeatedly emphasized the value of such evidence, especially in the context of sexual abuse cases. See Lindstadt, 239 F.3d at 203 ("In a credibility contest, the testimony of neutral, disinterested witnesses is exceedingly important."), quoting Williams, 59 F.3d at 681-82 (holding counsel's failure to investigate and call witnesses who could have bolstered defendant's defense that sexual abuse did not occur as alleged constituted ineffective assistance); See also Crisp, 743 F.2d at 585 (acknowledging the importance of "[h]aving independent witnesses corroborate a defendant's story"); Pavel, 261 F.3d at 224 ("Because of the importance of physical evidence in 'credibility contest' sex abuse cases, in such cases physical evidence should be a focal point of defense counsel's pre-trial investigation and analysis of the matter."). As the county court, itself, correctly determined, "the proper dating of the photographs and other material would have been beneficial to defendant." (Exhibit C, at 3). The county court's contradictory finding that the absence of such evidence did not prejudice Petitioner stands at odds with well-settled case law of the Second Circuit, as well as the decisions of other federal courts to have faced a similar set of facts.

In Lindstadt, for example, one of the alleged errors involved counsel's failure to effectively argue the relevance of the proposed testimony of the defendant's probation officers, resulting in the preclusion of that testimony by the trial court. Discussing the impact of that error, the Second Circuit recognized that

53

although counsel highlighted the challenges to the credibility of the prosecution's witnesses, and although both the defendant and his wife testified about their marital disputes and the acrimony in the household, "[t]he probation officers, as outside, impartial observers of the [defendant's] household, could have provided essential corroboration for [defendant's] testimony that his wife was vindictive ...." 239 F.3d at 205.

Similarly, in Gersten, the Second Circuit held that a county court's finding – that the testimony of the prosecution's expert "had been effectively neutralized by [defense counsel's] cross-examination," and that there was no "reasonable probability" that counsel's failure to introduce an expert who would have challenged the validity of the prosecution expert's theories – was an unreasonable application of Strickland. Gersten, 426 F.3d at 612. In finding that the prejudice prong had been satisfied despite counsel's skillful cross-examination, the court reiterated that

> The prosecution's entire case rested on the credibility of the alleged victim. All other evidence presented by the prosecution was indirect evidence offered to corroborate aspects of the alleged victim's story. Defense counsel's failure to investigate the prosecution's evidence led him to decide not to challenge what was clearly the most significant corroborative evidence .... Counsel's failure also prevented him from challenging the psychological evidence offered to explain the victim's delay in coming forward and failure to recall events in detail as the result of something other than a lack of credibility – which would as a general matter be a common inference to draw from such shortcomings.

54

Id. at 611-12; see also Byrd v. Trombley, 580 F.Supp.2d 542, 557-61 (E.D. Mich. 2008) (report and recommendation adopted) (holding state court's finding of no prejudice, based upon counsel's extensive cross-examination of expert witnesses, was unreasonable determination of facts because the concessions elicited during cross-examination were "no substitute for contradictory, scientifically grounded evidence which wholly contradicted their testimony"), aff'd, 352 Fed. Appx. 6 (6th Cir. 2009).   The Byrd court reasoned that because the case depended on the complainant's testimony as corroborated by the experts, a "properly called and examined expert . . . could have significantly undermined the objective expert testimony buttressing the victim's credibility in a way that cross-examination could not, and indeed did not, do." Id.

The evidence in both Lindstadt and Gersten included the testimony of the medical expert who examined the child, in addition to the testimony of the alleged victims, corroborative testimony from other prosecution witnesses, and "bolstering testimony from an expert on child psychology." Gersten, 426 F.3d at 613.   Such evidence was deemed by the Second Circuit to be "underwhelming" evidence against the petitioner, as "the only direct evidence against the petitioner consisted of the eyewitness testimony of the victim," there was no other eyewitness testimony to corroborate that of the victims, and "other than the prosecution's questionable medical expert testimony, the prosecution offered no objective

evidence to support an inference that any crime took place at all, and presented no physical evidence linking petitioner to any crime that occurred." Id.   Far from overwhelming, in this case there was even less; the prosecution presented no testimony from physicians alleged to have examined the complainants.   As in Lindstadt and Gersten, "where the record evidence in support of a guilty verdict is thin, as it is here," the county court's finding that Petitioner was not prejudiced by counsel's failure to investigate the key evidence corroborating the complainants' story "was an unreasonable application of Strickland." Id. at 614, citing Lindstadt, 239 F.3d at 205.

Indeed, a single error, should it go to the heart of the case, will render representation ineffective, even though counsel's performance in other respects is adequate.   The failures of trial counsel here were multiple and inexcusable.   The fraudulent physical evidence created an independent basis from which the jury could find that a relationship existed between Gina, Barbara and Kerri during 1998 and 1999.   A simple investigation of the physical evidence by defense counsel would have proven that this relationship could not have started until late 2000 or mid-2001. It bolstered the testimony of Barbara and Kerri, as well as Cindy Green and Sharleen Petersen, while destroying the testimony of the defense witnesses, including Petitioner.   As the prosecutor said so eloquently in summation:

> At any point in time, during this trial, if you are at all confused about Barbara Monaco and her time line, this exhibit, People's 32, should take her

56

out of the middle of the pile of confusion and put her at the top of crystal clear evidence. The date is on the back. No one hand wrote it. It's here and the defense can't get out from under it.

And why was such a big deal made about the time frame?  Because members of the jury, if you believe the girls and you believe Barbara and Kerri that they did spend time at the defendant's home in 1998 and 1999, well, that evidence sinks him.

(Tr. 2398).

And it did. But it was a lie.

### 3. Spillover Prejudice

Although the false evidence bears most directly on counts 1-4 (the sexual conduct alleged to have occurred "on or about and between the end of 1998 and beginning of 1999," this Court "must consider the spillover effect [of counsel's errors] on the remaining counts." Lindstadt, 239 F.3d at 205, citing, e.g., United States v. Morales, 185 F.3d 74, 82 (2d Cir. 1999).  In assessing the spillover prejudice, the courts are guided by three factors:  (i) "whether the evidence on the vacated counts was inflammatory and tended to incite or arouse the jury to convict the defendant on the remaining counts"; (ii) "whether the evidence on the vacated counts was similar to or distinct from that required to prove the remaining counts"; and (iii) "the strength of the government's case on the remaining counts." Id., citing United States v. Naiman, 211 F.3d 40, 50 (2d Cir. 2000).

Here, as in Lindstadt, the first factor weighs strongly in favor of vacating the remaining counts.  "[S]exual abuse of a child is a heinous crime and those who

57

commit it are thought by many to be serial offenders and incorrigible; a jury that finds a defendant guilty of [multiple] counts of sexual abuse on one occasion is primed to find the defendant guilty of another." Lindstadt, 239 F.3d at 206; see also Gersten, 426 F.3d at 614 ("In a case where the evidence against petitioner was generally 'underwhelming,' the counts that respondent argues were insulated from prejudice were the weakest of all.").

The second factor likewise indicates the spillover prejudice to the remaining counts. The primary evidence as to the vacated counts is not just similar, but nearly identical to count 10, which involves the same alleged victim, Barbara Monaco, but a different date – "on or about the summer of 2003." As stated above, had counsel introduced the evidence proving that the dates provided for the prosecution's physical evidence were false, and that Barbara's testimony that she failed to disclose the alleged abuse sooner because of a Law and Order SVU episode that had not yet aired, that evidence would have undermined Barbara's testimony that she was abused during a period between 1998-1999, a time period during which both Petitioner and his granddaughter claimed they had not yet met Barbara. More important, however, such evidence would have significantly damaged Barbara's credibility while bolstering the credibility of Petitioner and the defense witnesses. As this case was a clear credibility contest, the evidence likely would have "cast doubt on the veracity of the alleged victim's testimony in its

58

entirety," and thus counsel's errors can be presumed to have "infect[ed] all of the counts of which petitioner was convicted." See Gersten, 426 F.3d at 614-15.

Although counts eight and nine involve the alleged sexual abuse of Kerri Petersen in 2003, the proper dating of the physical evidence would have cast doubt on Kerri's veracity as well. Falsely corroborating Barbara's testimony, Kerri repeatedly insisted that she met Gina and Barbara at the same time, and that they were friends (and therefore knew Petitioner) in 1998-1999. The jury clearly relied on Kerri's credibility in reaching convictions on counts eight and nine, and the credibility finding clearly relied on the fact that both Barbara and Kerri's testimony was consistent with, and bolstered by, the physical evidence introduced by the prosecution and fraudulently dated by the prosecution's witnesses. Evidence establishing that the girls had lied, or were mistaken, about when the alleged abuse occurred would significantly damage Kerri's credibility, and might lead the jury to question how the stories of both Barbara and Kerri shared the same incorrect details – likely causing the jurors to infer that the girls collaborated in fabricating the allegations against Petitioner; a conclusion which the jury seemingly reached as to the counts concerning Kerri's sister, Brittany, and her friend, Stephanie, of which Petitioner was acquitted. The evidence supporting all of the counts is the same, in that the primary evidence as to all counts was the alleged victim's testimony. Thus, this court should not refuse vacatur of the remaining counts

simply because all of the evidence supporting it is infected by less than all of the errors affecting the other counts. Lindstadt, 239 F.3d at 206.

Finally, as to the last factor – the strength of the prosecution's case on the remaining counts – those counts were supported by no more evidence than the vacated counts. The prosecution relied solely on the word of the alleged victims, and, as in Lindstadt, "was not buttressed by physical evidence or expert testimony of any kind." Id. Here, the trial was rendered unreliable by counsel's errors, which enabled the prosecution to go untested in submitting false, key evidence corroborating the stories and bolstering the credibility of the complainants; the inflammatory results of the these errors infected all counts, and necessitate vacatur of all counts on which Petitioner was convicted.

FOR A SECOND CLAIM FOR RELIEF:

THE ADMISSION OF FALSE TESTIMONY AND FRAUDULENT PHYSICAL EVIDENCE VIOLATED PETITIONER'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES.

A.    Statement of Relevant Facts

In addition to the ineffective assistance of counsel claim, Petitioner also alleged a violation of due process in his § 440 motion to vacate, based upon the fraudulent nature of the physical evidence and the fact that the prosecutor knew or, at the very least, should have known the evidence was not what the People claimed

it to be.   In the alternative, the Petitioner requested a hearing.   Plaintiff further claimed that even if the prosecution had no reason to know of the false evidence, the admission of the evidence violated his right to due process under the Fourteenth Amendment.

Without holding an evidentiary hearing, the Suffolk County Court denied the motion on the sole basis that:

> [T]here was no evidence in the record before the Court that would tend to show that the prosecutor knew or should have known that the photographs, "Turbo-Twist" and "Law and Order" episode were from a time other than that represented at trial (People v. Stern, 226 AD2d 238 [1996]).   Indeed, with respect to the first photograph, the People relied on the testimony of the defendant's own daughter who provided a time frame for the photograph.

(Decision and Order, Dec. 14, 2009, at 3).

An application for leave to appeal the denial of the § 440 motion to the Appellate Division, Second Department, was denied on April 7, 2010.

**B.**   **Argument:  The County Court's Finding That There Was No Evidence That The Prosecution Knew Or Should Have Known The Evidence Was False Was An Unreasonable Determination Of The Facts In Light Of The Evidence Presented.**

> "Few rules are more central to an accurate determination of innocence or guilt than the requirement . . . that one should not be convicted on false testimony."
>
> -Sanders v. Sullivan, 900 F.2d 601, 607 (2d Cir. 1990).

First, the Suffolk County Court made an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).   The Coney

Island photograph was not authenticated by Petitioner's daughter, as stated by the county court, rather the fraudulent "authentication" was supplied by Petitioner's ex-daughter-in-law, Cindy Green. Cindy Green was undergoing a bitter divorce with Petitioner's son at the time of trial, and she deeply resented Petitioner and his entire family. To the extent that the county court was suggesting that the prosecutor should have been able to rely on Cindy Green, as the "defendant's own daughter" would have no reason to offer testimony harmful to the defendant unless it was true, the court has misstated the facts. Indeed, Cindy Green's very animus toward Petitioner, coupled with the questionable basis by which she concluded the photograph had been taken in 1998, should have caused the prosecutor to pause for further investigation. But there is more.

The record conclusively establishes that the prosecutor at least looked at the back of the photograph. During her summation, while arguing that the jury should focus on the "6/98" date on the photograph's jacket, the prosecutor stated: "There is no date on the back of this photo. . . ." (Tr. 2417). Given the prominence of the serial number on the reverse, it is equally certain that the prosecutor must have seen it. To assert that it never occurred to anyone in the Suffolk County District Attorney's Office that those numerals might mean something is beyond belief, especially when the dating of the Coney Island photograph was the one piece of evidence that corroborated Barbara Monaco and was the most crucial piece of

physical evidence in the entire case. As argued at length, *supra*, any competent defense attorney would have attempted to determine the actual dates the Coney Island and Halloween photographs were taken, the date the Turbo Twist Speller was made, and the date the Law & Order: SVU aired. Since the provenance of all of these matters could be ascertained with certainty, without relying on the memories or truthfulness of partisan witnesses, any prosecutor who actually believed her witnesses would attempt to corroborate them independently. One does not have to be either Sherlock or Oliver Wendell Holmes to come to this conclusion.

Beyond its unreasonable determination of the facts, the Suffolk County Court's denial of Petitioner's § 440.10 motion was based upon "an unreasonable application of federal law." 28 U.S.C. § 2254(d)(1). It has long been established that obtaining a conviction through testimony known by the prosecutor to be false violates the Constitution. Mooney v. Holohan, 294 U.S. 103 (1935). Prosecutors under New York law have an affirmative obligation "to seek justice, not merely to convict." Jenkins v. Artuz, 294 F.3d 284, 296 n.2 (2d Cir. 2002). Consequently, a prosecutor cannot avoid the prohibition against proffering false testimony simply by closing his or her eyes and ears. When the prosecution introduces evidence that

the prosecutor "knew, or *should have known*"[18] was false, a defendant's right to due process is violated. See Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003) [hereinafter "Drake I"], quoting United States v. Agurs, 427 U.S. 97, 103 (1976); see also Shih Wei Su v. Filion, 335 F.3d 119, 126-127 (2d Cir. 2003) (accord). While there is no rule of automatic reversal, the judgment must be set aside unless there is no "reasonable likelihood that the false [evidence] could have affected the judgment of the jury." Harris, 288 F.Supp.2d at 261, quoting Agurs, 427 U.S. at 103. Under this standard, "[r]eversal is virtually automatic." United States v. Gallego, 191 F.3d 156, 162 (2d Cir. 1999).

Ordinarily, "[a] state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" Drake v. Portuondo, 553 F.3d 230, 239 (2d Cir. 2009) [hereinafter "Drake II"]. However, since the county court "failed to permit development of the factual record," the AEDPA requires no deference to the county court's conclusions. Id. Given the existing factual record, the Suffolk County Court's determination that there is no evidence "that would tend to show that the prosecutor knew or should have known" that the fraudulent

---

[18] Evaluating the claim under the AEDPA's "clearly established federal law" standard, in Drake v. Portuondo, 553 F.3d 230 (2d Cir. 2009), the Second Circuit held that, at the time of the petitioner's trial, no Supreme Court case had "clearly established," by its holding, that a due process violation is established where a prosecutor "should have known" that the evidence provided by its witness was false. Id. at 240 (identifying the "should have known" language in Agurs as dicta). Nevertheless, the legal principle of imputed knowledge, which may be relevant to this case, was "clearly established" in Giglio v. United States, 405 U.S. 150, 153 (1972) (holding that although prosecutor did not have "actual knowledge" that the witness's trial testimony was a lie, he is charged with the knowledge of another representative in the office because of the duty of a prosecutor's office to "insure communication of all relevant information" to the prosecutors on a case). In this case, the knowledge of an investigator for the prosecution will be imputed to the prosecutor; further discovery is necessary to determine whether any such investigation occurred.

timeline provided by the prosecution's witnesses and the physical evidence was false is an unreasonable application of clearly established federal law.  While the court prevented Petitioner from ascertaining additional information relevant to the issue of the prosecution's knowledge, *vel non*, of the false nature of the evidence, the current record suggests that someone in the District Attorney's Office may have directed an investigation into the strenuously contested timeline of the complainants, and the prosecution's strongest corroboration thereof.  Thus, the court's decision arguably ignores the well-established legal principle of imputed knowledge, set forth by the Supreme Court in <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972). <u>See also Kyles v. Whitley</u>, 514 U.S. 419, 437-38 (1995) (extending <u>Giglio</u> to allow police officer's knowledge of witness's lies to be charged to prosecutor, holding prosecutor "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police").  The decision also contradicts Supreme Court precedent equating with knowledge situations in which "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." <u>See</u> <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).

As to materiality, as detailed in claim one, *supra*, the prosecution's false evidence was crucial to Petitioner's conviction.  The credibility of the complainants was the crux of the prosecution's case, and the fraudulently dated

evidence provided neutral, physical evidence that was vitally important to the jury's assessment of the veracity of the complainants.  As reiterated by the Second Circuit in Drake II:

> the principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.

553 F.3d at 245.

Here, Petitioner has made a colorable claim and has introduced evidence that tends to show that the People knew or should have known their evidence was false. An evidentiary hearing was required.  Because the Suffolk County Court "did not permit the development of the factual record as to whether the prosecution knew" the dating of the physical evidence to be false, there is no way for this Court to assess whether the court's decision "represented an unreasonable application of federal law." See Drake I, 321 F.3d 338, (2d Cir. 2003) (remanding the case to the district court for discovery, recognizing:  "Where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, bee able to demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry"), quoting Bracy v. Gramley, 520 U.S. 899, 908-09 (1997).  Thus, this Court should conduct limited discovery on the "circumstances surrounding" the false evidence, and the prosecution's investigation into the dating of the evidence.

66

See Drake II, 553 F.3d at 238, 247, quoting Vasquez v. Hillery, 474 U.S. 254, 257-58 (1986) (The Supreme Court has "never held that presentation of additional facts to the district court, pursuant to that court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts."); Drake I, 321 F.3d 338, 346-47 ("[A] petitioner cannot be said to have 'failed to develop' a factual basis for his claim unless the undeveloped record is a result of his own decision or omission."), quoting McDonald v. Johnson, 139 F.3d 1056, 1059 (5th Cir. 1998).

**C.** **Argument:  Even Absent The Prosecution's Knowledge, The Admission Of The Material False Evidence Violated Petitioner's Right To Due Process Under The Fourteenth Amendment.**

1. The County Court Never Adjudicated The Due Process Issue, But This Court May Consider The Nature Of The Evidence, And Its Impact, In The First Instance.

The other branch of Petitioner's motion, which was completely ignored by the Suffolk County Court, focused on the nature of the fraudulent evidence, even if the People did not know, nor should have known, of its actual character.  The county court apparently concluded that the testimony and physical evidence introduced by the prosecution as to the complainants' timeline was false, acknowledging that "the photographs, 'Turbo-Twist' and 'Law and Order' episode were from a time other than that represented at trial." (Exhibit C, Decision and Order, Dec. 14, 2009, at 3).  However, the court refused to make a factual

67

determination as to the materiality of the false evidence and its impact, simply rejecting Petitioner's due process claim in *toto* upon the finding of a lack of evidence "that the prosecutor knew or should have known" that the evidence was false. (Exhibit C, at 3).

Assuming that the People were able to convince the court that making a telephone call to Polaroid Corporation, doing two internet searches of the U.S. Patent and Trademark Office, and "Googling" "Law & Order: Special Victims Unit" are such amazingly sophisticated investigative techniques that the average ADA or police officer would never think of them, habeas relief is still warranted. As the Second Circuit held in Sanders v. Sullivan, 863 F.2d 218 (2d Cir. 1988):

> There is no logical reason to limit a due process violation to state action defined as prosecutorial knowledge of perjured testimony or even false testimony by witnesses with some affiliation with a government agency. Such a rule elevates form over substance. It has long been axiomatic that due process requires us 'to observe that fundamental fairness essential to the very concept of justice.' It is simply intolerable in our view that under no circumstance will due process be violated if a state allows an innocent person to remain incarcerated on the basis of lies. A due process violation must of course have a state action component. We believe that Justice Douglas accurately articulated the appropriate definition that accords with the dictates of due process: a state's failure to act to cure a conviction founded on a credible recantation by an important and principal witness, exhibits sufficient state action to constitute a due process violation.

Id. at 224 (internal citations omitted). Thus, under the Second Circuit's holding in Sanders, a conviction based upon false material evidence violates due process even in the absence of the prosecutor's actual, imputed, or constructive knowledge.

The applicability of Sanders, a pre-AEDPA case, was called into question in Drake I, 321 F.3d 338 (2d Cir. 2003). In Drake I, the Second Circuit evaluated a due process claim under the deferential standard of the AEDPA, which "permits [a federal court] to rely only on clearly established Supreme Court precedent," in reviewing cases that were adjudicated on the merits in state court. Id. at 345, n.2. Recognizing that Sanders "explicitly relied on Justice Douglas' dissent" in Durley v. Mayo, 351 U.S. 277 (1956), the Second Circuit determined that the Supreme Court has not yet clearly established that perjured testimony violates due process in the complete absence of prosecutorial knowledge. Drake, 321 F.3d at 345. Thus, as to claims reviewed under the AEDPA standard, habeas relief is available only if the prosecution had knowledge of the perjury. see Harris, 288 F.Supp.2d at 261. Sanders remains persuasive precedent, however, in cases where the deferential AEDPA standard is inapplicable.

In Ortega v. Duncan, 333 F.3d 102 (2d Cir. 2003), a case decided months after Drake, the Second Circuit relied on Sanders and granted habeas relief, finding the introduction of false testimony violated due process even in the absence of prosecutorial knowledge. Ortega, 333 F.3d at 108, n.3 ("we treat this case as one in which there was no prosecutorial knowledge of the perjury"; at most, petitioner claims the prosecution "should have known"). The deferential AEDPA standard was inapplicable in Ortega, because, although the petitioner raised the claim in his

69

§ 440 motion, the state court "never adjudicated the issue of [the] perjury," and thus there was no adjudication on the merits of that claim. Id. at 108; see also Id. at 106 (noting that the state court "refused to make any factual finding with respect to [the government witness's] credibility, making the usual question of the degree of deference to accord such a finding inapplicable here."), citing Channer v. Brooks, 320 F.3d 188, 195 (2d Cir. 2003) (per curiam) ("Where a state court does not resolve a question of fact, no presumption of correctness can possibly attach with respect to that issue.").

Here, as in Ortega, this Court may review Petitioner's claim under a *de novo* standard of review. Petitioner exhausted his state remedies as to this claim, and it was not denied on procedural grounds; but the Suffolk County Court failed to actually consider the merits of Petitioner's due process claim. In this case, the court correctly determined the evidence was false, however, where the prosecution neither knew nor should have known that the evidence was false, "due process is violated only 'if the [evidence] was material and the court is left with a firm belief that but for the perjured [evidence], the defendant would most likely not have been convicted.'" Ortega v. Duncan, 333 F.3d at 108, quoting, United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). Since the county court never adjudicated the materiality of the prosecution's false evidence and ignored, entirely, this branch of Petitioner's due process claim, the deferential standard under the AEDPA is

70

inapplicable, and this Court may consider the impact of the false evidence "in the first instance." See Ortega, 333 F.3d at 108, n. 4.

    2. The False Dating Of The Prosecution's Key Physical Evidence, Which Bolstered The Stories And The Credibility Of The Complainants And Undermined The Petitioner's Core Defense That He Did Not Know The Complainants At The Time The Sexual Abuse Allegedly Occurred, Was Essential To Petitioner's Conviction.

It is true that when the prosecution did not know, nor should have known, that the evidence was false, a higher standard of materiality applies; a court must find that the "jury probably would have altered its verdict" if it had the opportunity to learn that the evidence placed before it was false. The court must look to the impact of the evidence "not only upon the factual elements of the government's case but also upon the credibility of the government's witness." Ortega, 333 F.3d at 109, quoting, United States v. Stoksky, 527 F.2d 237, 246 (2d Cir. 1975).

This standard **does not** require that the petitioner prove that he would have been completely exonerated of every charge lodged against him—the impossible standard imposed by the county court in adjudicating the § 440.10 motion. Rather, a court must "consider whether there was a significant chance that [knowledge of the false testimony] developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." Ortega, 333 F.3d at 109, quoting, United States v. Seijo, 514 F.2d 1357, 1364 (2d Cir. 1975). In other words, had the fraudulent nature of the evidence been made known to the

71

jury, was there a "significant chance" that at least one juror, on one charge, would have held out for acquittal.

In Ortega, the Second Circuit carefully reviewed the potential impact of a prosecution witness's false testimony both on the merits of the People's proof and the credibility of the People's witness.   The petitioner in Ortega had been convicted of murder.   The two surviving victims testified at trial.   One of the victims and a third eyewitness, Garner, identified the defendant as the shooter. The second victim, Narvaez, testified that defendant was not the shooter, and testified that he did not see Garner at the scene.   After trial, Garner recanted his testimony.   The Second Circuit found that Garner's false testimony was material, and granted habeas relief.   The court reasoned:

> Set against the contradictory testimony of the two victims, Garner's testimony had the probable impact of swinging the balance against [the petitioner] and undermining the veracity of Narvaez.   Based on Garner's assumed credibility, the jury likely relied on his testimony in answering the difficult question of which victim to believe.   Additionally, as an alleged uninvolved bystander . . . Garner's testimony may have made an even greater impression with the jury than the testimony of the victims.

Ortega, 333 F.3d at 109.

The physical evidence in this case had a similar impact.   Like Garner's testimony in Ortega, the photographs were the only concrete, disinterested evidence linking Petitioner to the complainants at the time of the alleged crimes, likely causing the jury to place great weight on this evidence.   Here, too, the

72

alleged victims provided contradictory testimony – with Barbara and Kerri alleging abuse, and Gina refusing the alleged sexual abuse ever occurred. The physical evidence undeniably had the effect of undermining the veracity of Gina, and "swinging the balance against" Petitioner, as it aided the jury in determining who to believe. There was no physical evidence of the alleged abuse, and no witnesses other than the alleged victims, who disclosed the abuse years after it allegedly occurred. The crux of the prosecution's case was the credibility of Barbara and Kerri, and the false evidence was not just material to the credibility of the alleged victims, it was directly related to the central issue in the case – whether Petitioner even knew the girls at the time the abuse was alleged to have occurred. Had the jury learned this crucial evidence was false, there is no reason to believe the jury would have credited Barbara and Kerri any more than it credited the other two alleged victims, Stephanie and Brittany, whose testimony was not corroborated by any physical evidence at trial. As Petitioner was acquitted of the counts pertaining to those girls, it cannot be said that Petitioner would have been convicted of the remaining counts had it known the corroborating evidence was false.

## **CONCLUSION**

For the foregoing reasons, the Petition for a Writ of Habeas Corpus should

be granted or, in the alternative, an evidentiary hearing held thereon.


Dated:      New York, New York
            November 21, 2012

                              Respectfully Submitted,


                              LEA SPIESS [LS-7866]
                              RONALD L. KUBY [RK-1879]
                              Law Office of Ronald L. Kuby
                              119 West 23rd Street, Suite 900
                              New York, NY  10011
                              (212) 529-0223

                              Attorneys for Petitioner Thomas F. Green