**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
THOMAS F. GREEN,

               Petitioner,

        -against-

WILLIAM LEE, Superintendent of Green
Haven Correctional Facility, and the
ATTORNEY GENERAL OF STATE OF NEW
YORK,

              Respondents.
-------------------------------------------------------X

FILED
CLERK

8/12/2013 10:07 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM OF**
**DECISION AND ORDER**
12-cv-5796 (ADS)

<u>**APPEARANCES:**</u>

**The Law Office of Ronald L. Kuby**
*Attorneys for the Petitioner*
119 West 23rd Street, Suite 900
New York, NY 10011
    By: Ronald L. Kuby, Esq.,
       Lea Marie Spiess, Esq., Of Counsel

**Thomas J. Spota**
Suffolk County District Attorney
*Attorneys for the Respondent*
200 Center Drive
Riverhead, NY 11901
    Karla Lato
    Assistant District Attorney

**SPATT, District Judge**.

      The presently incarcerated petitioner Thomas F. Green brings this petition for a writ of

*habeas corpus* pursuant to 28 U.S.C. § 2554 on the grounds (1) that he was denied his

constitutional right to effective assistance of counsel and (2) prosecutorial misconduct.  The

Court finds that the Petitioner has established that he received constitutionally inadequate

assistance of counsel and that a "reasonable probability" exists that the outcome of the trial

1

would have been different had he received effective assistance of counsel. Thus, Green was deprived of a fair trial.

For the reasons that follow, the habeas petition is conditionally granted.

## I.  BACKGROUND

**A.  <u>The Trial</u>**

On April 17, 2007, a Suffolk County Grand Jury indicted the Petitioner on ten counts related to the alleged sexual molestation of his granddaughter, G.G., and four of her friends, B.M., B., S., and K. The indictment, as supplemented by a bill of particulars, alleged that the crimes were committed in both public and private places and during particular seasons in 1998-1999, 2001, and 2003.

B.M., the first of the complainants to accuse Green of sexual abuse, did not come forward until the Fall of 2006. Although B.M. also alleged that G.G. had been abused as well, G.G. denied that any abuse had taken place. Green has consistently denied that such abuse occurred, and has denied even knowing B.M. in 1998-1999.

Counts one through four of the indictment involved incidents that allegedly took place between the end of 1998 and 1999. The Petitioner allegedly committed sodomy in the first degree twice against B.M., attempted sodomy in the first degree against G.G., and sexual abuse in the first degree against B.M.

Count five accused the Petitioner of sexual abuse in the first degree against B. during the summer of 2003.

Counts six and seven accused the Petitioner of sexual abuse in the first degree against S. during the summer of 2001.

Counts eight and nine accused the Petitioner of sexual abuse in the first degree and sexual abuse in the second degree against K. during the summer of 2003.

Count ten accused the Petitioner of sexual abuse in the second degree against B.M. during the summer of 2003.

A jury trial commenced in July 2008 before Judge Barbara R. Kahn in Suffolk County, County Court.

**1. <u>Opening Statements</u>**

Relevant here, in its opening statement, the People indicated that, in the winter of 1998 to 1999, B.M. and G.G. "spent almost every weekend together at [the Petitioner's] house." (Tr. 41.) The People also asserted that on one occasion during this time period, the Petitioner sexually assaulted B.M. and G.G. (Tr. 41-44.) By contrast, in Green's opening statement, the trial counsel, Paul Gianelli, stated that B.M. "[wa]s absolutely wrong. She did not spend time in Mr. Green's presence and with [G.G.] in 1998. You'll hear from witnesses who will say that it never happened." (Tr. at 54.)

**2. <u>The People's Case</u>**

The jury first heard testimony from B.M. She testified that, when she was seven years old, in 1998, she met G.G. and that thereafter, G.G. was her best friend. (Tr. at 513-14.) B.M. stated that, at this time, she began spending nights at Green's home. (Tr. at 522.) According to B.M., she and G.G. slept at Green's home "[e]very weekend," and "every day" during the summer of 1998. (Tr. at 522.) In this regard, the People introduced into evidence a photograph of B.M. and G.G. together dressed in Halloween costumes. According to B.M., the Halloween photograph was taken on Green's front porch when she was seven years old in 1998. (Tr. at 516-17; Plf's Exh G.)

B.M. further testified that at some point during the winter of 1998-1999, she was sexually molested by Green. (Tr. at 541-42.) In particular, B.M. testified that on one occasion, B.M., G.G., and Green watched a scary movie that they rented from Blockbuster Video. (Tr. at 543.) B.M. and G.G. became frightened by the movie, and the girls slept that night with Green in his bed. (Tr. at 544.). During the night, B.M. stated that she awoke to find that Green had pushed aside her underwear and had his mouth on her vagina. (Tr. at 544-45.) B.M. stated that she kicked Green in the face and he fell over. (Tr. at 545.) B.M. further stated that she was too scared to leave the bed and fell back asleep. (Tr. at 546.)

B.M. also stated that she was later awakened when G.G. "punched [her] in the face . . . because [G.G.] woke up to [Green] trying to do the same thing to her." (Tr. at 545) B.M. stated that she instructed G.G. to kick Green in face, which G.G. did. (Tr. at 545.) The two girls subsequently fled to the next room and locked the door. (Tr. at 547-548.)

At some point, Green unlocked the door and asked the girls if they wanted to see a magic trick. (Tr. at 549.) Green allegedly told B.M. that she would have to put her mouth on his penis to see the trick. (Tr. at 549.) After initially refusing, B.M. relented and put her mouth on his penis but removed it when she began to gag. (Tr. at 550.)

B.M. stated that afterward, she fell asleep. (Tr. at 551.) B.M. later awoke and found herself again in Green's bed, and Green was rubbing his penis against her vagina. (Tr. at 550-51.) She stated that she pushed Green away and told him to stop. (Tr. at 551.)

B.M. testified that the two girls made a pinky promise that they would tell others about the incident when they got older. (Tr. at 552, 561.) The next day, Green wore a bandage on his nose. (Tr. at 547.) He allegedly warned B.M. that if anyone asked about the bandage, she should say that Green fell down the stairs. (Tr. at 563-64.) Green allegedly advised B.M. not to tell

4

anyone about the previous night because other people would not understand about having "fun."

(Tr. at 567.)

With regard to the belated disclosure of the abuse, B.M. testified as follows:

Q.  Why didn't you want to right away?

A. Cause I was scared.

. . .

Q.  Where did you talk to [G.G. immediately after the incident]?

A.   In Mr. Green's bathroom.

Q.  And what did you say to her?

A.  I told her when we get older and ready to face it that we were going to tell.

Q.  And what did you do in that regard?

A.  We made a pinky promise to tell.

Q.  What was the reason you didn't want to tell then?

A.  Because I knew I wasn't going to be able to go through all this at that age.

Q.  What does that mean, "all this"?

A.  All the courts, all that, I wouldn't understand all of it, it was so frustrating when I was younger.

(Tr. at 552, 561-62.)

On cross-examination, B.M. testified:

Q.  And you indicated that you made a decision that you were going to tell when you got older?

A.  Yes.

Q.  And you say at the time this happened you were seven years old, right?

A.  Yes.

Q.  And one of the reasons that you and [G.G.] made this particular promise when you were seven years old was that you said "I knew I wasn't going to be able to go through this at that age"?

A.  Yes.

Q.  That you didn't want to go through all the courts, I wouldn't understand all of it, right?

A.  Yes.

Q.  Let me ask you this.  At age seven, how did you know what you were going to go through with the courts?

A.  Cause my mom used to watch Law and Order.

Q.  You understood at age seven what was going to happen?

A.  I understood that it was a big responsibility, yes.

Q.  And because of what you saw on Law and Order you made a decision with [G.G.] not to disclose this, is that what you're saying?

A.  And I knew that [G.G.] –

Q.  No.  No.  Is that what you're saying?

A.  Yes.

Q.  Was there a particular show on Law and Order that left this impression on you when you were seven?

A.  No, it's just Law and Order.

Q.  What?

A.  It's just another Law and Order show.

Q.  Was there a show about a young girl who was seven years old who had to go to court?

A.  No.

Q.  Or anything like that?

A.  No, but [Law and Order: Special Victims Unit] is all about molestation and rape.

. . .

Q.  Was that on in 1998?

A.  Yes.

Q.  It was?

A.  Yes.

Q.  You used to watch it?

A.  Yes.

Q.  So you made a decision – could you distinguish between, you know, fiction on TV and real life? Could you do that?

A.  Yes.

(Tr. at 710-12.)

On re-direct examination, B.M. testified as follows:

Q.  You had testified before on cross-examination that telling would be a big responsibility, what does that mean?

A.  It's just how I am now, if I was seven, if I was ten years younger now, could you see me up here doing this? I can't.

(Tr. at 770.)

After the alleged incident, Green began giving B.M. money and gifts. (Tr. at 568-69.)  In that regard, the People introduced into evidence a device called a "Turbo Twister Speller" that Green gave to B.M. to help with her spelling. (Tr. at 580.)  B.M. stated that Green gave her the "Turbo-Twister" toy when she "started failing school . . . for spelling" in "third grade." (Tr. at 580.)  B.M. stated that she was in third grade in 1999. (Tr. at 521.)  B.M. also noted that she had to repeat third grade in the year 2000. (Tr. at 521.).

Green also allegedly referred to B.M. as his granddaughter. (Tr. at 586.).  B.M. continued to go with G.G. to Green's house because she was afraid something worse would happen to G.G. if G.G. were left alone with Green. (Tr. at 536, 566-67.)

B.M. also testified that thereafter, she would take her anger out on Green. (Tr. at 595.)  She stated what when she was 10 or 11 years old, she would put makeup and nail polish on him while he napped. (Tr. at 595.)  Other times, she would smack his penis "[b]ecause [she] wanted him to feel how [she] fe[lt]." (Tr. at 595-96.)  B.M. testified that at about this time, she went

7

from being a quiet child to a girl who became involved in fights and performed poorly in school. (Tr. at 626.)

According to B.M., another incident occurred in the summer of 2003, when B.M. was twelve years old. (Tr. at 593.) While at a Sports Plus store, Green allegedly grabbed B.M.'s hands and pulled them behind her and held her hands to his penis. (Tr. at 593.) B.M. stated that she told Green to stop and shoved him. (Tr. at 593.) A friend of B.M.'s from school allegedly witnessed the incident and asked her what occurred. B.M. told the witness nothing happened because she was embarrassed. (Tr. at 594.)

B.M. further stated that even after she and G.G. were no longer friends, Green gave money to B.M. (Tr. at 615.) B.M. also testified that when she was 15 years old, she and her friend Mary once rode their bikes past Green's house. (Tr. at 617.) They stopped to speak to Green. (Tr. at 617.) After the girls told Green that they were going shopping, he gave B.M. $25. (Tr. at 617.) B.M. testified that she and Green then kissed. (Tr. at 617) When Mary commented to B.M. that the interaction between B.M. and Green was "weird," B.M. told Mary about the alleged abuse on the part of Green. (Tr. at 617-18.) B.M. then disclosed the same to Mary's older sister, Rosemary, who related this information to B.M.'s mother. (Tr. at 621.)

B.M.'s parents spoke to her and B.M. ultimately told them that something happened with Green, but would not give them any specifics. (Tr. at 622-24.) B.M. spoke with G.G. and reminded her of the pinky promise and that it was time to tell the truth about Green's abuse. G.G. disagreed. (Tr. at 627.)

B.M. further testified that authorities interviewed her at school. (Tr. at 628.) She stated that she declined to discuss anything with them because she was uncomfortable around the two male interviewers. (Tr. at 630.) Then, B.M. stated that, one day, as B.M. rode past Green's

house and observed one of his granddaughters sitting on Green's lap, she realized that she had to tell authorities because she was afraid that Green would continue abusing girls. (Tr. at 630-31.). Thereafter, B.M. spoke to K. about Green's actions towards her and asked her if something sexual happened to her with Green as well, and K. said yes. (Tr. at 631.)

K. was also a witness at the trial. K. testified that she met B.M. and G.G. when they were seven or eight years old. (Tr. at 163.) The three of them would spend time at Green's house and enjoy the use of the pool. (Tr. at 168.) K. confirmed that the pool was operating and in use in 1998. (Tr. at 176-77.)

According to K., sometime in the summer of 2003, when she was "about twelve," Green took her to a Carvel ice cream store. (Tr. at 204-205.) She stated that, when the salesperson went to get her ice cream, Green, who was standing behind her, took her hands, put them behind her back, and made her touch his penis for "like a minute." (Tr. at 206-08.) K. did not immediately tell anyone about the incident but decided never to be alone with Green again. (Tr. at 251.)

K. further testified that in November 2006, she disclosed to her Aunt Maureen that Green had molested her. (Tr. at 252-53, 257-59.) K. and her Aunt then disclosed the same to K.'s mother. (Tr. at 262-263.) After K. disclosed the occurrence to her mother, K. spoke with S., who told K. that the Petitioner molested her as well. (T. at 340-41.)

In particular, S. testified that, on one occasion during the summer of 2001, when she was 10 years old, Green took her, K., and G.G. shopping. (Tr. at 395-96.) While K. and G.G. were in the dressing room, Green allegedly stood behind S., grabbed her hands, and pulled them behind her back. (Tr. at 396.) He rubbed S.'s right hand against his penis. (Tr. at 396, 402-04). S. testified that she immediately ran away and told K. what had transpired; however, K. had testified that she did not know about the incident until a week or two after it occurred. (Tr. at

338, 341, 404.)  At the trial, S. could not remember when during the summer this incident occurred. (Tr. at 396.)

The jury also heard testimony from Detective Amy Goldstein, who was assigned to the investigation in November 2006 when she took a call from K.'s uncle.  According to Goldstein, on December 11, 2006, K. told her about what Green did to her at Carvel.  The conversation was reduced to writing. (Tr. at 820-24.)  Similarly, Goldstein testified that B.M. told her about the incident at Green's house in the winter of 1998 when she was seven years old. (Tr. at 829-30.)  A written statement was taken from B.M. (Tr. at 828-33.)  Goldstein also spoke with B., K.'s younger sister.  At that point, B. made no allegation of sexual abuse by Green. (Tr. at 827.)  However, Goldstein testified that, while the case was being prepared for presentation to the grand jury, B. admitted to the prosecutor that Green had touched her vagina. (Tr. at 826-28.)

Goldstein also testified about an interview that she conducted with Green at his home. (Tr. at 834-38)  Goldstein and a colleague read Green his rights, which he allegedly waived. (Tr. at 840.)  Green denied the allegations of sexual abuse.  He stated that K., B., and B.M. were G.G.'s friends and that, at his house where the girls would sleep over, they swam, watched television, and used the computer.  (Tr. at 854-56.)  He stated that if the girls fell asleep in his bed, he would sleep on the couch. (Tr. at 854.)

At this interview, Green revealed that, on one occasion, B.M. pulled a towel off him, exposing his penis. (Tr. at 854.)  Green described B.M. as "hypersexual" and recalled an incident where he found B.M. masturbating. (Tr. at 854-56.)  Green admitted to taking K. to Carvel on one occasion, but denied K.'s allegation of forcible touching. (Tr. at 854-55.)  Green indicated that he did not understand why the girls were making the allegations of sexual abuse and that he was sorry that they felt this way. (Tr. at 858-859.)

10

Goldstein further related that K.'s mother called her and gave her names of other possible victims. (Tr. at 862-63.) Goldstein subsequently interviewed S. regarding the summer 2001 incident. (Tr. at 863.) Goldstein testified that when she interviewed G.G., she did not disclose that Green had sexually abused her. (Tr. at 863-64.)

The jury then heard testimony from G.G., who testified that B.M. did not begin "regularly hanging out" with B.M. until 2001. (Tr. at 977.) Rather, G.G. testified that B.M. was never at Green's house in 1998 and did not start staying at his house until she was eight years old in November 2000. (Tr. at 974.) In particular, G.G. testified as follows:

Q. You know then that [B.M.] says that you were friends in 1998 to 1999, correct?

A. Yeah.

Q. And you disagree with that?

A. Yes.

Q. How is that you recall that it was 2000 and 2001 when you were friends with [B.M.]?

A. 'Cause I was in, like, activities in those days. I was very young. And I remember when we started BMX that's when we started actually hanging out every day.

Q. So it's your testimony that you weren't really friends with [B.M.] until you started BMX?

A. Yeah.

(Tr. at 1139.) G.G. testified that she never went to Coney Island with B.M. prior to 2000, and never went there with B.M. when G.G. was six or seven years old. (Tr. at 1140.) G.G. also denied any sexual abuse by Green, or that Green offered to show B.M. and her a magic trick, and denied ever kicking Green in the face. (Tr. at 993-95.) G.G. also denied speaking to the police in January 2007. (Tr. at 1005.)

The People then expressed to the Court that

G.G. has affirmatively damaged the People's position in many regards

. . .

This witness [] has testified with respect to timeframe . . . which contradict[s] the other witnesses in the case that say the crimes and these incidents of friendship had occurred between 1998 and 2003. So the timeline has been effectively damaged in that each of the other witnesses and their credibility is certainly at issue and they have all said that the 1998 to 2000 time frame they were friends with [G.G.].

(Tr. at 1126-27.)

To rebut G.G.'s testimony disputing B.M.'s timeline, the People called

G.G.'s mother, Cindy Green. Cindy was Green's daughter-in-law, and was in the process

of divorcing Green's son. (Tr. at 1172, 1197-1198.) Cindy testified that G.G. had slept

over Green's house since she was born, and Cindy recalled that B.M. and K. slept over

there years before the girls started BMX biking in 2001. (Tr. at 1189-92.)

The People introduced into evidence a souvenir Polaroid photograph taken at

Coney Island depicting a laughing G.G. and B.M. sitting in a giant chair with a big,

plastic bottle of beer. (Tr. at 1173-75.) The photograph contained a souvenir jacket,

which bore the imprint "6/98." (Tr. at 1177-1178.) Although Cindy was not present

when the photograph was taken, and had no memory of the event depicted in the

photograph, she identified her daughter as being "six [or] seven" years old at the time.

(Tr. at 1174, 1192-1193.) Cindy testified that she was certain of that time frame because

her daughter's hair was long at that time. (Tr. at 1175-76.) The Prosecutor elicited the

following testimony from Cindy with respect to the Coney Island photograph:

Q. And I just direct your attention to the back of the folder that holds the picture,
the white writing. . . . [D]o you see a date in the back of the picture printed on the
covering?

A. Mm-hmm.

Q. What is that date?

A. 6/98.

(Tr. at 1177-1178.)

The jury also heard testimony from B., who stated that, on one occasion, during the
summer of 2003, Green touched her vagina as she sat on his lap in his home. (Tr. at 1228-1233.)
B. indicated that she did not tell anyone at the time of the incident because she was embarrassed.
(Tr. at 1234.) However, B. stated that she eventually told her mother about the incident, and then
B. told the police. (Tr. at 1236.)

The jury also heard expert testimony from Dr. Eileen Treacy about child sexual abuse
accommodation syndrome. Treacy testified that an offender gains access to a child by spending
time with the child and giving the child presents. (Tr. at 1537.) Treacy further stated that if the
offender breaks down a child's inhibitions and gains the victim's trust, abuse can occur. (Tr. at
1537- 42.) Treacy testified that, at the time of the abuse, the abuser may stress secrecy to the
victim, either through threats or instilling a perception that something bad will occur if disclosure
is made. (Tr. at 1538-39.) Treacy also stated that, if the abuse occurs in a public place, because
of a child's limited experience, an abused child may not know how to react and may not cry out.
(Tr. at 1553-54.) Moreover, Treacy stated that a child victim may not know how to label the
abuse. (Tr. at 1546.) Finally, Treacy stated that it is uncommon for a child to make an immediate
disclosure of sexual abuse, and when a child does disclose, it is usually after the victim has

thought through the disclosure and at which point he or she may not be able to give details due to memory problems. (Tr. at 1548, 1551, 1562-63.)

**3. Green's Case**

In Green's case, several of Green's family members testified that the family did not meet B.M. and her mother, Denise, until 2000. First, Paula Green, the Petitioner's niece by marriage, testified that she introduced B.M. to Green in the summer of 2000, when Green invited them to use his pool. (Tr. at 1624-1625.). When confronted with the Coney Island photograph, Paula testified that B.M. looked about five years old there. (Tr. at 1663-64.)

Similarly, Patricia Green, one of the Petitioner's three adult daughters, testified that she resided in her parents' home in the winter of 1998-1999 and did not meet B.M. until she moved out in June 2000. (Tr. at 1694, 1697-98.) Patricia had no recollection of any of the victims, including G.G., sleeping over the house during those periods. (Tr. at 1702.) In addition, Patricia testified that the swimming pool, which B.M. and K. insisted they swam in during the summers of 1998 and 1999, was inoperable between 1997 and 1999. (Tr. at 1686-87, 89.).

Joanne Green, the Petitioner's wife, also testified that the pool was inoperable in 1997 to 1999 because of a lack of funds to fix the lining. (Tr. at 1781-1782, 1807-09, 11.) Joanne recalled meeting B.M. and her mother in 1998 or 1999. (Tr. at 1769, 1782.) At that time, Joanne visited her sister in Brooklyn every two to three weeks and stayed overnight. (Tr. at 1776-79.) She recalled that B.M., K., and B. slept over her house but could not recall specific instances. (Tr. at 1785-86.)

Josephine Adams, another of the Petitioner's adult daughters, testified that she lived at Green's house in the summer of 1998, but did not know B.M. or see her at Green's house that summer. (Tr. at 1839-40.) When confronted with the Coney Island photograph, Josephine

14

testified that G.G. looked "about eight" years old in the picture. (Tr. at 1847.) Also, Annmarie Castelli, the last of the Petitioner's adult daughters, testified that the swimming pool was not operating in 1997 to 1999 and that she first met B.M. during the summer of 2000. (Tr. at 2010, 2043.)

Rosann Billotto, a neighbor of B.M., testified that B.M. had a reputation for being untruthful. (Tr. at 1991-92.) The jury also heard testimony from Thomas Mayer, the district manager of the local Blockbuster Video, who testified that Green's Blockbuster card was not issued until September 1, 2000. (Tr. at 1969.)

Finally, Green took the stand in his own defense. He denied that any abuse, sexual or otherwise, took place. (Tr. at 2125, 2134.) Green stated that G.G. and B.M. began to sleep over his house when they started BMX racing, in or about 2001. (Tr. 2087, 2095.) He also stated that he did not know B.M. or K. prior to 2000. (Tr. at 2124-25, 2128, 2207.) Green indicated that he first met B.M. when she and her mother stopped by his house during the summer of 2000, once the pool was open. (Tr. at 2089-91.) He not only denied molesting K.; Green denied ever taking her to Carvel. (Tr. at 2125-2126.) Green admitted to giving gifts and money to children but denied giving large amounts. (Tr. at 2110.) Green testified that he recalled telling Goldstein about G.G. pulling the towel off of him and about catching B.M. masturbating. (Tr. at 2129-31.) However, as to the towel incident, Green stated that his private parts were never exposed, just his buttocks. (Tr. at 2199.)

On cross-examination, Green admitted that he held several drivers' licenses over the years and drove without a license for 10 years. (Tr. at 2065.) Green further conceded that, in the mid-1980s, he applied for a new license using a forged document to provide a false date of birth

and gave a false residential address to avoid being linked to his original suspended license. (Tr. at 2066-67, 2147-48, 2152.)

4. People's Rebuttal Case

On rebuttal, the People re-called Thomas Mayer, who testified that another Blockbuster card was issued in Green's name in 1994 and showed Cindy as an authorized user.

5. Summations

In the Defendant's summation, his trial counsel stated:

[W]e have to rely on children's fragile and perhaps, biased recollections, about when this incident supposedly took place.

(Tr. at 2344.) The trial counsel further stated with respect to the Coney Island photograph:

Ms. Brown may have gotten up here and said that the back of this card – not on the photo, but on the back of the card, is printed 6/98. She will submit it to you this picture was taken in '98.

I submit to you we have pictures that indicate to you the length of G.G.'s hair, that were put in with Annmarie Castelli [that indicate otherwise] and you have to decide whether or not Cindy Green has a particular axe to grind in this particular case, because of her divorce proceeding.

(Tr. at 2360-61.)

In her summation, the Prosecutor described Green's case as follows:

At first, the defense suggested through cross-examination that the girls all banded together to help [B.M.] Then that kind of moved towards another theory. We go to the pool liner was changed three times, so there is no way [B.M.] spent time at that home from 98' to 2000.

And then we morphed away from that, again, to the pool was out of commission and [G.G.] had long hair in 2000 and she didn't start spending time with [B.M.] until then. And here are all of these photos to prove that.

(Tr. at 2376.) The Prosecutor emphasized the time line presented by B.M. and highlighted the reliability of the Coney Island photograph as physical evidence of B.M.'s narrative:

Ladies and Gentlemen, there is one piece of evidence that the defense can't get around in this case, although he tried. This photograph of [G.G.] and [B.M.] in a chair at Coney Island, testified to by [G.G.]'s mother, Cindy Green. With a date on the back of June of 1998. Take it in the back and look at it. And compare the way in which [G.G.] looks in this photograph to the defense exhibits that the family historian AnneMarie Castelli entered into evidence.

There is no date on the back of this photo, but there is a date on the jacket that it came in. The only date that exists on the back of the defense photos, of [G.G.], with all different hairstyles, its one date. . . July of 2000.

(Tr. at 2416-17.) The Prosecutor further characterized the Coney Island photograph as

"the one piece of evidence in the whole case that is not capable of lying, and puts G.G.

and B.M. together at the time frame that B.M. tells you, around 1998 when B.M. is seven

and G.G. is six." (Tr. at 2419.) In this regard, the Prosecutor stated:

Josephine Adams came before you and tried to suggest, or stated to you, that [G.G.] was eight in this photograph. That should be an insult to your intelligence.

At any point in time, during this trial, if you are at all confused about [B.M.] and her time line, this exhibit, People's 32, should take her out of the middle of the pile of confusion and put her at the top of crystal clear evidence. The date is on the back. No one hand wrote it. It's here and the defense can't get out from under it.

(Tr. at 2419.) The Prosecutor also emphasized the centrality of the Halloween

photograph as physical evidence corroborating B.M.'s narrative of events.

People's 18 is in evidence. [B.M.] testified about her and [G.G.] going trick or treating. [B.M.] said she was seven. And so, at Halloween time, [G.G.] would have been five, almost six.

(Tr. at 2418.) The Prosecutor further noted that B.M. and K.'s testimony worked in

tandem to corroborate each other:

[K.] and [B.M.] both told you they were around 6, 7 old when they met [G.G.], and each – and met each other soon after that. That is sometime around 1998. . . [K.] told you she had been spending time with [G.G.] and the defendant since she was 7 or 8 years old. She testified that she was there almost every weekend, starting in 1998 or so.

(Tr. at 2377, 88.)  The Prosecutor explained:

> And why was such a big deal made about the time frame? Because members of
> the jury, if you believe the girls and you believe [B.M.] and [K.] and they did
> spend time at the defendant's home in 1998 and 1999, well, that evidence sinks
> him.  And so the defense witnesses have to say, the time frame is just wrong.
> B.M. is a flat-out liar.  Because again, they don't want you to find [B.M.] worthy
> of belief.  Because if you do, you will convict him.

(Tr. at 2398.)

    6.  <u>The Verdict</u>

Following the four-week trial, on August 21, 2008, the jury returned a verdict

against Green, finding him guilty of (1) two counts of sodomy in the first degree against

B.M. in violation of Penal Law §130.50; (2) one count of attempted sodomy in the first

degree against G.G., in violation of Penal Law §110-130.50; (3) two counts of sexual

abuse in the first degree in violation of Penal Law § 130.65 against B.M. and K. and

(4) two counts of sexual abuse in the second degree against B.M. and K. in violation of

Penal Law §130.60.  Green was acquitted of three counts of sexual abuse involving B.

and S.  Following the verdict, Green was remanded to the custody of the Suffolk County

Sheriff as is required by statute.  <u>See</u> Criminal Procedure Law § 530.45.

    **7.  <u>The Post-Verdict Motion</u>**

On October 14, 2008, Green, represented by new counsel, contacted Jay

Salpeter, a licensed private investigator, for the purpose of participating in his post-

conviction defense. (Petitioner's Exh Q).  Salpater had previously been retained by

the trial counsel, but for unexplained reasons, trial counsel ceased contact with Salpater

prior to the trial.

The thrust of the testimony of B.M., the People's main witness, is that she was

sexually molested by Green during the winter of 1998-1999.  With very little effort and

easy access, the previously retained investigator ascertained that the film used in the Coney Island photograph was not manufactured until several years after the date the People represented the photograph was taken. With respect to the Halloween photograph, again with little effort, the investigator discovered that the sweatshirt worn by B.M. displayed a logo of a company that did not enter commerce until three years after the date testified to at the trial. In addition, the investigation revealed that the "Turbo-Twister" toy spelling machine given to B.M. by Green did not enter commerce until August, 2001, not the years 1998 to 1999, as the testimony at the trial stated. Finally, with respect to the reasons for B.M.'s delayed disclosure of the alleged sexual abuse, Green's subsequent investigation revealed that the first episode of Law & Order: SVU did not air until several months after the time that B.M. suggested at the trial that she viewed the program. These dates were crucial in that the Defendant and G.G. both testified that the family did not even meet B.M. and her mother until the year 2000.

In support of this motion, Green submitted an affidavit dated January 17, 2009 from Cindy confirming that, despite her testimony to the contrary, Green's investigation convinced her that "the first possible date that [the Coney Island photograph] could have been taken is June 21, 2000." (Petitioner's Exh J.) In this regard, Cindy essentially recanted her testimony as to the timing of the underlying events.

Green also submitted an affidavit dated January 26, 2009 from the trial counsel who admitted that "[t]here was no strategic reason for [his] failure" to obtain the correct documentation with respect to the Coney Island photograph. Indeed, the trial counsel admitted that he "never examined" the reverse side of the Coney Island photograph nor

sought any documentation concerning the disputed pieces of evidence. The trial counsel conceded that such documentation for the above-mentioned pieces of evidence "would have proved indispensable in presenting [the] defense and discrediting the People's witnesses." (Petitioner's Exh P).

In an order dated June 29, 2009, the County Court denied the Criminal Procedure Law §330.30 motion, finding, in part, that it could not adjudicate claims of ineffective assistance of counsel resting on matters not appearing on the record. (Petitioner's Exh B). In addition, the court found that it "[could not] conclude . . . that trial counsel's failure to obtain this new information prior to trial 'would require a reversal or modification of the judgment as a matter of law by an appellate court.'" (Id., citing Criminal Procedure Law §330.30[1]).

### 8. The Judgment and The Post-Judgment Motion

On July 16, 2009, the County Court sentenced Green to an aggregate term of 35 years of incarceration. Thereafter, Green moved pursuant to Criminal Procedure Law §440.10(1)(b),(c), and (h) for an order vacating the judgment of conviction. Again, Green maintained that his trial counsel failed to fully investigate the authenticity of certain items of evidence offered against him at the trial and therefore deprived him of the effective assistance of counsel. Also, Green contended that the People knew or should have known of the false nature of the evidence offered against him which corroborated the testimony of the victims, thereby depriving him of the constitutionally mandated due process of law.

In opposition to the motion to vacate, the People submitted an affidavit dated August 13, 2009 from the trial prosecutor, Dana Brown, who indicated that she "did not

know about any of the inaccuracies regarding the dates pertaining to the contested items

of evidence that were introduced at trial." Brown also stated that she "had no reason to

question the witnesses' recollection with regard to the dates the photographs were taken;"

"had no reason to know, nor should [she] have known" about the Law and Order

discrepancy; and did not become aware of these inaccuracies until Green filed his

Criminal Procedure Law §330.30 motion. In this way, in effect, the People conceded the

dating inaccuracies of the subject evidence except as to the Turbo Twister. The People

maintained that B.M. could have received the Turbo Twister in third grade and in the

year 2000, rather than the year 1999, because she repeated third grade in the year 2000.

In an order dated December 14, 2009, the County Court denied the Criminal

Procedure Law §440 motion without a hearing, finding as follows:

> [T]he constitutional requirement of effective assistance of counsel is satisfied
> when 'the evidence, the law, and the circumstances of a particular case, viewed in
> totality and as of the time of the representation, reveal that the attorney provided
> meaningful representation (see People v. Baldi, 54 NY2d 137. [1981]). In order
> to prevail on a claim of ineffective assistance of counsel, the defendant must
> overcome a strong presumption that defense counsel rendered effective
> assistance; a simple disagreement with strategies, tactics, or the scope of possible
> cross-examination, weighed long after the conclusion of the case, will not suffice
> (People v. Benn, 68 NY2d 941 [1986]). Indeed, "a reviewing court must avoid
> confusing true ineffectiveness with mere losing tactics and according undue
> significance to retrospective analysis" (People v. Baldi, supra). Instead, it is
> incumbent on defendant to demonstrate the absence of strategic or other
> legitimate explanations for counsel's alleged shortcomings (People v. Benevento,
> 91 NY2d 708 [1998]).
>
> Here, while defense counsel's post-trial investigation has revealed that certain
> items of evidence originated from a time other than that represented at trial, the
> Court cannot say that defendant received the ineffective assistance of counsel.
> Having presided over this rather lengthy trial, this Court observed first hand trial
> counsel's skilled cross-examination of each [of] the victims and several other
> People's witnesses. The issue of the credibility of the victims, present throughout
> the trial, was highlighted by trial counsel and specifically attacked on both cross-
> examination and through the testimony of defense witnesses. That attack was

met, to some degree, with obvious success inasmuch as the defendant was acquitted of charges relating to two alleged victims.

As to those specific items of evidence now at issue, this Court cannot say that counsel's failure to investigate the dating of the photographs, the date of manufacture of the "Turbo-Twist" or the airing date of a certain episode of "Law and Order: Special Victim's Unit," deprived Green of the ineffective assistance of counsel. While the Court may agree that the proper dating of the photographs and other material would have been beneficial to defendant, it cannot be said the absence of this properly authenticated evidence would have resulted in defendant's complete acquittal. There was sufficient evidence adduced at trial, separate and apart from the evidence at issue, to support the People's case and defendant's convictions.

Where, as here, the evidence and the circumstances of a particular case reveal that meaningful representation was provided, a defendant's constitutional rights to the effective assistance of counsel has been satisfied (see People v. Brown, 300 AD2d 314 [2002]; citing People v. Satterfield, 66 NY2d 796 [1985]). Accordingly, that branch of the defendant's motion to vacate his convictions based on the alleged ineffectiveness of trial counsel is denied.

(Petitioner's Exh C). As Green observes, the County Court's description of Cindy as "defendant's own daughter" was factually incorrect; Cindy was Green's daughter-in-law and, at the time of her testimony, was in the process of divorcing Green's son.

Green moved for leave to appeal from the County Court order denying his motion pursuant to Criminal Procedure Law §440.10. In an order dated April 7, 2010, Justice Reinaldo E. Rivera of the Appellate Division, Second Department denied that application. (Petitioner's Exh D.)

**9. The Direct Appeal**

On direct appeal from the judgment of conviction, Green argued, among other matters, that the County Court erred in holding that it did not have the discretion to entertain Green's Criminal Procedure Law §330.30 motion because the motion relied on matters outside the record. In an order dated February 21, 2012, the Appellate Division, Second Department rejected this argument and affirmed the judgment of conviction.

(Petitioner's Exh E, 92 A.D.3d 894, 939 N.Y.S.2d 487 (2d Dept. 2012). Green then sought leave to appeal to the New York Court of Appeals. In an order dated June 29, 2012, Judge Susan P. Read of the Court of Appeals denied that request. (Petitioner's Exh F).

### The Present Petition

On November 26, 2012, Green timely commenced the present petition for a writ of *habeas corpus* in this Court, or, in the alternative, that an evidentiary hearing be held. The Petition named William Lee, Superintendent of Green Haven Correctional Facility, and the Attorney General for New York State as Defendants. However, "[i]n a habeas corpus proceeding, 'the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General,' and no evidence is presented that an exception to the immediate custodian rule applies here." Gega v. Ercole, 11 CIV. 7892 AT KNF, 2013 WL 3971405 (S.D.N.Y. June 24, 2013); see Rumsfeld v. Padilla, 542 U.S. 426, 435–36, 124 S. Ct. 2711, 2718 (2004) (leaving open the question whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation).

In the petition, Green contends that he was deprived of his constitutionally protected right to the effective assistance of counsel based on the trial counsel's failure to investigate the timeline of the four pieces of evidence – namely, (1) the Coney Island photograph; (2) the Halloween photograph; (3) the "Turbo-Twister" Speller; and (4) the Law & Order testimony. Green also maintains that because the People knew or should have known that these pieces of evidence were falsely dated, his fourteenth amendment rights were violated.

23

## II. DISCUSSION

### A.  **Habeas Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may only grant a writ of habeas corpus for a claim that has been adjudicated on the merits by a state court if the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); accord, e.g., Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413, 120 S. Ct. 1495; Bell, 535 U.S. at 694, 122 S. Ct. 1843.  Under this latter standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S. Ct. 1495.  In order to grant the writ there must be "[s]ome increment of

incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Matter of Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted); accord, e.g., Matter of Richard S. v. Carpinello, 589 F.3d 75, 80 (2d Cir. 2009). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. As to Ineffective Assistance of Counsel**

Green contends that the state court decision denying his claim for ineffective assistance of counsel was both contrary to and an unreasonable application of the clearly established federal standard under the first subsection of § 2254(d). "Because the state court adjudicated the merits of his claim, [Green] must prove that the state court either identified the federal standard for ineffective assistance but applied that standard in an objectively unreasonably way, or that the state applied a rule that contradicts the federal standard." Rosario v. Ercole, 601 F.3d 118, 122 (2d. Cir. 2010); see also Lockyer v. Andrade, 538 U.S. 63, 73, 75-76, 123 S. Ct. 1166, 155 L.Ed.2d 144 (2003); Williams v. Taylor, 529 U.S. 362, 387-89, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

In Williams v. Taylor, the Supreme Court determined that Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the seminal case defining the contours of the right to effective assistance of counsel, qualified as "clearly established law" for purposes of the AEDPA. 529 U.S. at 390-91, 120 S. Ct. 1495. The Strickland test for ineffective assistance has two necessary components. The defendant must establish both that his attorney was ineffective and that the attorney's errors resulted in prejudice to the defendant. Id.; see also Strickland v.

Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Counsel is ineffective

when her efforts fall "'below an objective standard of reasonableness.'" Williams, 529 U.S. at

390-91, 120 S. Ct. 1495 (quoting Strickland, 466 U.S. at 688, 104 S. Ct. 2052). A defendant

satisfies the prejudice prong by proving that 'there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at

391, 104 S. Ct. 2052 (quoting Strickland, 466 U.S. at 694, 104 S. Ct. 2052).

The state court examined Green's claims under New York's constitutional standard for

ineffective assistance. New York's constitution, like the United States Constitution, affords its

citizens the right to competent representation by an attorney. See U.S. Const. amend. VI; N.Y.

Const. art. I, § 6; see also People v. Baldi, 54 N.Y.2d 137, 146, 444 N.Y.S.2d 893, 429 N.E.2d

400 (1981). However, New York's test for ineffective assistance of counsel under the state

constitution differs from the federal Strickland standard. The first prong of the New York test is

the same as the federal test; a defendant must show that his attorney's performance fell below an

objective standard of reasonableness. People v. Turner, 5 N.Y.3d 476, 480, 806 N.Y.S.2d 154,

840 N.E.2d 123 (2005). The difference arises in the second prong of the Strickland test. See id.

In New York, courts need not find that counsel's inadequate efforts resulted in a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. Instead, the "question is whether the attorney's conduct constituted egregious and

prejudicial error such that defendant did not receive a fair trial." Benevento, 91 N.Y.2d 708, 713,

674 N.Y.S.2d 629, 697 N.E.2d 584 (1998) (internal quotation marks omitted). Thus, under New

York law, the focus of the inquiry is ultimately whether the error affected the "fairness of the

process as a whole." Id. at 714, 674 N.Y.S.2d 629, 697 N.E.2d 584. The efficacy of the

attorney's efforts is assessed by looking at the totality of the circumstances and the law at the time of the case and asking whether there was "meaningful representation." Baldi, 54 N.Y.2d at 147, 444 N.Y.S.2d 893, 429 N.E.2d 400.

The New York Court of Appeals clearly views the New York constitutional standard as more generous toward defendants than the standard spelled out in Strickland. Turner, 5 N.Y.3d at 480, 806 N.Y.S.2d 154, 840 N.E.2d 123 ("Our ineffective assistance cases have departed from the second ('but for') prong of Strickland, adopting a rule somewhat more favorable to defendants." (citing cases)). To meet the New York standard, a defendant need not demonstrate that the outcome of the case would have been different but for counsel's errors; a defendant need only demonstrate that he was deprived of a fair trial overall. See People v. Caban, 5 N.Y.3d 143, 155-56, 800 N.Y.S.2d 70, 833 N.E.2d 213 (2005). A single error by otherwise competent counsel may meet this standard if that error compromised the integrity of the trial as a whole. Turner, 5 N.Y.3d at 480, 806 N.Y.S.2d 154, 840 N.E.2d 123.

The Second Circuit has repeatedly recognized that the New York "meaningful representation" standard is not contrary to the Strickland standard. Eze v. Senkowski, 321 F.3d 110, 123-24 (2d Cir. 2003); Loliscio v. Goord, 263 F.3d 178, 192-193 (2d Cir. 2001); Lindtadt v. Keane, 239 F.3d 191, 198 (2d Cir. 2001). For this reason, "[t]he only avenue of reprieve available to [Green] then is to establish that the state court unreasonably applied Strickland." Rosario, 601 F.3d at 126. Again, a state court "unreasonably applies" clearly established law when it identifies the correct legal principle from Supreme Court jurisprudence, but unreasonably applies the principle to the case before it. Williams, 529 U.S. at 412-13, 120 S. Ct. 1495. However, in order to prevail, Green must first satisfy the prongs of Strickland on *de novo*

27

review of the merits. <u>See</u> <u>Henry v. Poole</u>, 409 F.3d 48, 67 (2d Cir. 2005), <u>cert.</u> <u>denied</u>, 547 U.S. 1040, 126 S. Ct. 1622, 164 L. Ed. 2d 334 (2006).

1. **As to Whether Green states a Strickland Claim**

    a. **The Performance Prong**

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Wiggins v. Smith</u>, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting <u>Strickland</u>, 466 U.S. at 690, 104 S.Ct. 2052). Where, as here, the four contested pieces of evidence were introduced largely to establish a certain time frame, the failure by Green's trial counsel to investigate the correct time frame was not reasonable. This failure is particularly pronounced with respect to the Coney Island photograph because the date of that photograph represented at trial was drawn from writing on a folder containing the photograph, not even on the photograph itself.

"The duty to investigate is essential to the adversarial testing process '[b]ecause th[e] testing process generally will not function properly unless defense counsel has done some investigation into the People's case and into various defense strategies.'" <u>Greiner v. Wells</u>, 417 F.3d 305, 320 (2d Cir. 2005)(quoting <u>Kimmelman v. Morrison</u>, 417 U.S. 365, 384 (1986)). However, the duty to investigate does not compel counsel to conduct a comprehensive investigation of every possible lead or defense, <u>see</u>, <u>e.g.</u>, <u>Strickland</u>, 466 U.S. at 699; <u>Greiner</u>, 417 F.3d at 321, or "to scour the globe on the off-chance something will turn up." <u>Rompilla v. Beard</u>, 545 U.S. 374, 383, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005). "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." <u>Id.</u>

In a crucial part of the case, from the time of Green's arrest to the present, he has consistently maintained that he could not have committed certain of these offenses because he had not even met his accusers during some of the years they claimed to be abused. Nevertheless, despite the vital importance of these factual determinations, his trial counsel failed to make a reasonable investigation of the relevant time frame. In this regard, it appears that the relevant evidence regarding the time frame could have been easily obtained and, in fact, crucial to this determination, the private investigator, who was retained prior to the trial but never utilized by the trial counsel, averred that "[a]s an example of what could have been done had [trial counsel] utilized [his] services, within less than 24 hours of viewing the [Coney Island] photograph . . . through the Polaroid Corporation, [he] was able to establish that the testimony pertaining to the date of the photo being June, 1998 as presented at trial was erroneous." (Petitioner's Exh Q.) With respect to the Law and Order testimony, the private investigator stated that "a quick internet search [] immediately revealed that the very first episode of this program was September 20, 1999," many months after she alleged she was molested and failed to report it based on her viewing of the program. (Id.) The private investigator further averred that to verify the Law & Order information, he "plac[ed] a simple phone call to NBC's legal department." (Id.).

As the Second Circuit has noted, "[i]n nearly every case[, as here,] that concludes that counsel conducted a constitutionally deficient investigation, the courts point to readily available evidence neglected by counsel." Greiner, 417 F.3d at 322; see e.g. Rompilla, 125 S. Ct. at 2465-67 (faulting defense counsel for not consulting a "readily available file" "sitting in the trial courthouse, open for the asking" and emphasizing that "[t]he unreasonableness of attempting no more than they did was heightened by the easy availability of the file at the trial courthouse"); Williams, 529 U.S. at 395, 120 S. Ct. 1495 (faulting counsel for failing to access available

records); Kimmelman, 477 U.S. at 386-87, 106 S. Ct. 2574 (faulting counsel for failing to request discovery materials from People); Henry, 409 F.3d at 64-65 (faulting counsel for failing to discover obvious discrepancy in dates); Eze v. Senkowski, 321 F.3d 110, 128-30 (2d Cir. 2003) (faulting counsel for failing to consult available experts and medical literature); Pavel, 261 F.3d at 221 (faulting counsel for not interviewing "readily-available fact witnesses"); Lindstadt, 239 F.3d at 200 (faulting counsel for not obtaining information "available from a variety of sources"); Maddox v. Lord, 818 F.2d 1058, 1061-62 (2d Cir. 1987) (faulting counsel for failing to interview an available witness). In each of these cases, the reviewing court either granted habeas relief or remanded to the trial court for a hearing.

To be clear, the trial counsel does not assert that the failure to conduct this investigation was strategic; he admits it was a mistake. Further, the County Court conceded that "testimony will not reveal the trial counsel's strategy or tactics, the investigation was simply not done." The trial counsel also stated that the later-discovered evidence disputing the People's time frame "would have proved indispensable in presenting [the] defense and discrediting the People's witnesses." Indeed, the trial counsel's theory of the case – that Green did not know the accusers at the time of certain of the alleged offenses – "would have been aided rather than impeded by the introduction of evidence undermining the veracity of the [accusers]." Harris v. Artuz, 288 F. Supp. 2d 247, 259 (E.D.N.Y. 2003) affd, 100 F. Appx 56 (2d Cir. 2004).

This failure to conduct a reasonable investigation into the time frame takes on added significance in a child sexual abuse case. The Second Circuit has highlighted the importance of effective representation for defendants in child sexual abuse cases. See e.g. Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005). "Often the only witnesses to the alleged contact in child sexual abuse cases are the complainant and the accused. With third-party witnesses

frequently unavailable, these types of cases frequently turn into credibility contests in which the factfinder must choose between contradictory stories told by the defendant and the victim." Burch v. Millas, 663 F. Supp. 2d 151, 175 (W.D.N.Y. 2009)(internal citation omitted).  For this reason, the Second Circuit has instructed that an attorney representing a defendant on charges of child sexual abuse "is obliged, wherever possible, to elucidate any inconsistencies in the complainant's testimony, protect the defendant's credibility, and attack vigorously the reliability of any physical evidence of sexual contact between the defendant and the complainant." Eze, 321 F.3d at 112.

Seeking to portray the trial counsel's performance in a favorable light, the People point to the fact that the trial counsel (1) made numerous pretrial motions; (2) moved to bar the admission of evidence; (3) subpoenaed records from the Suffolk County Police Department, Blockbuster Video, Child Protective Services, and the complainants' school records; and (4) cross-examined B.M. and K. with respect to the timeline, testing their recall on issues such as if Green's pool was in disrepair during the years 1998 and 1999. (Tr. at 281, 653-55.)  Indeed, the People emphasize that the trial counsel introduced the testimony of several of Green's family members, and Green himself, all of whom testified that the family did not meet B.M. and her mother until the year 2000.

However, "[i]t is axiomatic that, even if defense counsel had performed superbly throughout the bulk of the proceedings, they would still be found ineffective under the Sixth Amendment if deficient in a material way, albeit only for a moment and not deliberately, and that deficiency prejudiced the defendant." Rosario, 601 F.3d at 138 (Straub, J. concurring and dissenting); see e.g., Henry, 409 F.3d at 72 ("[R]eliance on counsel's competency [in totality as opposed to particular deficient respect]. . . fail[s] to apply the Strickland standard at

all.")(internal citation and quotation marks omitted)); <u>Kimmelman</u>, 477 U.S. at 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) (noting that while "[i]t will generally be appropriate . . . to assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance," a "failure to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," may be constitutionally deficient irrespective of trial performance) (internal quotation marks omitted).

In this case, the Court finds that the trial counsel failed in his duty to present multiple material facts and exhibits, which, as explained previously, were easily obtainable and, with "reasonable probability," would have resulted in an acquittal. <u>See</u> <u>Hart v. Gomez</u>, 174 F.3d 1067, 1070-71 (9th Cir.1999) (holding that failure to introduce evidence supporting defendant's contention that sexual abuse could not have occurred under the circumstances alleged rendered counsel ineffective). Again, the trial counsel offers no strategic reason for not doing so, and, indeed, concedes that such an investigation would have been essential to Green's defense. In the Court's view, this failure plainly falls below acceptable professional standards under <u>Strickland</u>'s performance prong. <u>See</u> <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. 2052.

**b. The Prejudice Prong**

The Court also concludes that Green has satisfied the prejudice prong of <u>Strickland.</u> "The level of prejudice the [petitioner] need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" <u>Lindstadt</u>, 239 F.3d at 204 (quoting <u>Strickland</u>, 466 U.S. at 693). The Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

32

undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. "[T]he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." <u>Wilson v. Mazzuca</u>, 570 F.3d 490, 507 (2d Cir. 2009) (quoting <u>United States v. Dominguez Benitez</u>, 542 U.S. 74, 83 n.9, 124 S. Ct. 2333, 159 L. Ed. 2d 157 (2004) (citing <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed.2d 490 (1995))). "A reviewing court looks instead to whether the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." <u>Id.</u> (internal quotation marks omitted) (quoting <u>Dominguez Benitez</u>, 542 U.S. at 83, 124 S. Ct. 2333 (quoting <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. 2052)); <u>see also</u> <u>Porter v. McCollum</u>, 558 U.S. 30, 130 S. Ct. 447, 455-56, 175 L. Ed.2 d 398 (2009) (per curiam) ("We do not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'") (quoting <u>Strickland</u>, 466 U.S. at 693-94, 104 S. Ct. 2052)).

"[H]ighlighting the prejudicial effect of defense counsel's error in this case is the paucity of the prosecution's case," which rested in large measure of the alleged victims' testimony about events, some of had occurred almost a decade earlier. <u>Rosario</u>, 601 F.3d at 136 (Straub, C.J., dissenting and concurring). Again, despite the fact that some of the incidents took place in public places, there was no third-party eye witness testimony. Moreover, one of the alleged victims, G.G., denied that any abuse had taken place.

Indeed, the Second Circuit has recognized prejudicial impact in cases with more evidence of guilt than that presented here. For example, in <u>Lindstadt</u> and <u>Gersten</u>, as in this case, the complainant and the perpetrator were the only eyewitnesses who testified as to the alleged abuse.

However, in both of those cases, unlike here, there was medical expert testimony consistent with

sexual abuse.  Nonetheless, the Second Circuit granted habeas relief in both cases.

For example, in <u>Lindstadt</u>,

> The principal evidence against [the Defendant] was the testimony of his daughter and
> wife.  Both made the same one-year error in dating the incident alleged in the first four
> counts.  And though the prosecution now dates the incident in December 1985, the child's
> testimony fits the circumstantial details to the erroneous December 1986 date.

239 F.3d at 199.  The district court denied habeas relief, finding that "[t]he testimony regarding

what petitioner did lay at the heart of his conviction. Where and when he did it did not." <u>Id.</u> at

205.  The Second Circuit disagreed, noting that "aside from the testimony of [the expert], the

only evidence of abuse came from his wife and daughter; their credibility lay at the heart of the

prosecution's case.  Had defense counsel mounted a proper challenge to their testimony as to

where and when the abuse occurred, it would have naturally called into question whether the

abuse occurred at all." <u>Id.</u> at 204.  Further, the Second Circuit reasoned that "[a]n effective

lawyer who worked out the chronology of the events could have argued convincingly that the

child's errors evidenced manipulative coaching by an adult." <u>Id.</u> at 199.

Similarly, in <u>Gersten</u>, the Second Circuit found prejudice where

> the prosecution's entire case rested on the credibility of the alleged victim.  All other
> evidence presented by the prosecution was indirect evidence offered to corroborate
> aspects of the alleged victim's story.  Defense counsel's failure to investigate the
> prosecution's evidence led him to decide not to challenge what was clearly the most
> significant corroborative evidence -- the medical expert testimony that the physical
> condition of the alleged victim supported a conclusion that penetration had taken place.

426 F.3d at 612.

Further cutting in favor of a finding of prejudice here is the extent to which the People

relied on the contested pieces of evidence throughout the trial to rebut Green's defense that he

did not know some of the accusers at the time of certain of the alleged offenses.  As noted above,

in the People's summation, the trial prosecutor referred to the Coney Island photograph as the "one piece of evidence that the defense can't get around" and "the one piece of evidence in the whole case that is not capable of lying." (Tr. at 2416-2417, 2419.)  Further, the trial prosecutor explained to the jury that "if you are confused about [B.M.] and her time line . . . [the Coney Island photograph] should take her out of the middle of the pile of confusion and put her at the top the crystal clear evidence." (Tr. at 2419.)  Now, in defending the habeas cause, the People refer to the photograph as "collateral" and "cumulative" evidence. (People's Brf, at 14.) However, as Green's counsel aptly states, "[w]hat the prosecution cannot be permitted to do is proffer evidence, passionately argue for its centrality to obtain a conviction, then abandon reliance on that evidence once the conviction is obtained and the evidence is shown to be false." (Green's Reply Brf, at 7-8.)

In a similar vein, the People contend that despite the trial counsel's failure to investigate the origins of the Coney Island photograph, "he presented the ultimate argument for the jury to consider, i.e., that the photograph was not, in fact, taken in 1998." (People's Brf, at 13.)  To support this contention, the People highlight the fact that trial counsel introduced numerous exhibits and witnesses who challenged B.M. and K.'s timeline and whether they knew G.G. in the years 1998-1999.  However, the fact that the trial counsel raised this issue at trial only underscores the importance of this evidence and the prejudicial impact of his constitutionally deficient performance.  An accurate dating of this physical evidence would have bolstered the testimony of G.G. and Green's family members and would have cast doubt on the credibility of B.M. and K.  Furthermore, "[h]ad defense counsel mounted a proper challenge to their testimony as to where and when the abuse occurred, it would have naturally called into question whether the abuse *occurred at all*." Lindstadt, 239 F.3d at 205 (emphasis added).

35

Under these circumstances, the Court concludes that this evidence, taken together, clearly establishes a "reasonable probability" that the outcome of the trial would have been different had trial counsel investigated and presented this evidence. See Hart, 174 F.3d 1067 (holding that, even with the defendant's confession to abusing a child on previous occasions, there was not overwhelming evidence that defendant abused the child on the charged occasion).

## 2. Habeas Corpus Standards

Pursuant to 28 U.S.C. § 2254, even if a habeas petitioner, as here, establishes a Strickland violation, a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits" by the state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under this principle of deference, habeas relief may not be granted merely upon a "conclusion that counsel's performance was constitutionally inadequate." Carrion v. Smith, 549 F.3d 583, 591 n.4 (2d Cir. 2008). Rather, the "petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." Jones v. West, 555 F.3d 90, 96 (2d Cir. 2009) (quoting Sorto v. Herbert, 497 F.3d 163, 169 (2d Cir. 2007)). Moreover, "because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles, 556 U.S. 111, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009). Nevertheless, "the increment of incorrectness beyond error need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Georgison v. Donelli, 588 F.3d 145, 154 (2d Cir. 2009) (internal brackets omitted) (quoting Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006)).

However, a close review of the County Court's decision makes clear that, even affording the state court its due deference, its decision rejecting Green's claim of ineffective assistance of counsel constituted an unreasonable application of Strickland – both on the performance prong and the prejudice prong – and should not stand.

First, with respect to the trial counsel's performance, the County Court held:

> [T]he Court cannot say that defendant received the ineffective assistance of counsel. Having presided over this rather lengthy trial, this Court observed first hand trial counsel's skilled cross-examination of each [of] the victims and several other People's witnesses. The issue of the credibility of the victims, present throughout the trial, was highlighted by trial counsel and specifically attacked on both cross-examination and through the testimony of defense witnesses. That attack was met, to some degree, with obvious success inasmuch as the defendant was acquitted of charges relating to two alleged victims.

As the Second Circuit has recognized, "[[t]he New York standard is not without its problems." Rosario, 601 F.3d at 125. In defining prejudice to include "the context of whether defendant received meaningful representation," Benevento, 91 N.Y.2d at 713, 674 N.Y.S.2d 629, 697 N.E.2d 584,

> New York has, to some degree, combined the two prongs of Strickland. Prejudice to the defendant, meaning a reasonable possibility of a different outcome, is but one factor of determining if the defendant had meaningful representation. New York courts look at the effect of the attorney's shortcomings as part of the equation in deciding if the defendant received the benefit of competent counsel. This approach, and the language of Benevento, creates a danger that courts might misunderstand the New York standard and look past a prejudicial error as long as counsel conducted himself in a way that bespoke of general competency throughout the trial. That would produce an absurd result inconsistent with New York constitutional jurisprudence and the mandates of Strickland.

Rosario, 601 F.3d at 125-126. In this case, the state court's analysis of the trial counsel's performance throughout the trial "provides strong indications that this is precisely what happened here." Id. at 139. (Straub, J. dissenting and concurring) (stating that he would have

found that the state court abandoned the <u>Strickland</u> analysis for a rule less favorable to

defendants).

> With respect to prejudice, the County Court stated that
>
> [w]hile it may agree that the proper dating of the photographs and other material would have been beneficial to [Green], it cannot be said the absence of this properly authenticated evidence would have resulted in [Green]'s complete acquittal. There was sufficient evidence adduced at trial, separate and apart from the evidence at issue, to support the People's case and defendant's convictions.

In this way, the County Court applied an overly demanding standard of prejudice,

essentially rejecting Green's claim of ineffective assistance of counsel because Green

could not prove to a certainty that he would have been totally convicted "but for" the trial

counsel's deficient performance. This strict "but for" standard is different from and

an "unreasonable application" of <u>Strickland</u>'s more defendant-friendly "reasonable

probability" standard and is therefore constitutionally deficient. <u>Wilson</u>, 570 F.3d at 507

("[T]he reasonable-probability standard is not the same as, and should not be confused

with, a requirement that a defendant prove by a preponderance of the evidence that but

for error things would have been different.") (citations and quotation marks omitted).

Thus, the Court grants Green's petition for habeas relief as to counts 1-4 (the sexual

abuse alleged to have occurred on or about and between the end of 1998 and the

beginning of 1999).

### 3. **Spillover**

 "[A] court that overturns fewer than all criminal counts must consider the

spillover effect on the remaining counts." <u>Lindstadt</u>, 239 F.3d at 205; <u>see</u> <u>also</u> <u>United</u>

<u>States v. Morales</u>, 185 F.3d 74, 82 (2d Cir. 1999). Three factors, which the People fail to

address, guide the inquiry on impermissible spillover:

> 1) whether the evidence on the vacated counts was inflammatory and tended to incite or arouse the jury to convict the defendant on the remaining counts;
>
> 2) whether the evidence on the vacated counts was similar to or distinct from that required to prove the remaining counts; and
>
> 3) the strength of the government's case on the remaining counts.

United States v. Naiman, 211 F.3d 40, 50 (2d Cir. 2000).

As to the first factor, "sexual abuse of a child is a heinous crime and those who commit it are thought by many to be serial offenders and incorrigible; a jury that finds a defendant guilty of three counts of sexual abuse on one occasion is primed to find the defendant guilty of another." Lindstadt, 239 F.3d at 296.

Also, the second factor tips toward a finding of spillover prejudice. The evidence relating to counts 1-4 involves the same alleged victim, B.M., as count 10, but a different date – "on or about the summer of 2003." Had the trial counsel established that some of the evidence surrounding the 1998-1999 incident was falsely dated, this evidence may have damaged B.M.'s credibility while bolstering the credibility of Green and the defense witness. Inasmuch as this case involved a credibility contest, the newly discovered evidence would have "cast doubt on the veracity of the alleged victim's testimony in its entirety," and thus counsel's errors can be presumed to have "infect[ed] all of the counts of which petitioner was convicted." Gersten, 426 F.3d at 614-15.

Similarly, although counts eight and nine involve the alleged sexual abuse of K. in 2003, the proper dating of the physical evidence would have cast doubt on her credibility as well because she testified that she, B.M., and G.G. spent time with Green in 1998 to 1999. The newly discovered evidence tending to show that the B. M. and K. were, at the very least, mistaken might lead the jury to question how their stories shared

the same incorrect details. In any event, the Court "sees no good reason to refuse vacatur of "Counts 9 and 10" simply because all of the evidence supporting it is infected by less than all of the errors affecting the other counts." Lindstadt, 239 F.3d at 206.

Finally, as to the third factor – the strength of the prosecution's case on the remaining counts – because the People relied on expert testimony about child sexual abuse accommodation syndrome, there was concededly more evidence than those remaining counts in Lindstadt. However, the only direct evidence here linking Green to the alleged abuse was the alleged victims' testimony.

Accordingly, the Court grants Green habeas relief as to the remaining outstanding counts of the indictment. In light of the Court's ruling on the Petitioner's ineffective assistance claim, the Court need not address Green's additional grounds for habeas relief based on prosecutorial misconduct and the state court's failure to conduct a post-judgment evidentiary hearing.

### 4. **Remedy**

"Federal habeas corpus practice . . . indicates that a court has broad discretion in conditioning a judgment granting habeas relief. Federal courts are authorized . . . to dispose of habeas corpus matters as law and justice require." Hilton v. Braunskill, 481 U.S. 770, 775, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987) (internal quotation marks omitted); accord, Levine v. Apker, 455 F.3d 71, 77 (2d Cir. 2006). "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." United States v. Morrison, 449 U.S. 361, 364, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981).

"The typical relief granted in federal habeas corpus is a conditional order of release," <u>Herrera v. Collins</u>, 506 U.S. 390, 403, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993), requiring the state either to release the prisoner from custody or retry him in a constitutional manner within a reasonable period of time. <u>See</u> <u>Morales v. Portuondo</u>, 165 F.Supp.2d 601, 608-09 (S.D.N.Y. 2001). In rare cases, however, a court may grant unconditional, immediate release. <u>Morales</u>, 165 F. Supp. 2d at 608 ("Unconditional release, however, is a remedy rarely granted.") (citing <u>Cody v. Henderson</u>, 936 F.2d 715, 719 (2d Cir. 1991); <u>Simmons v. Reynolds</u>, 898 F.2d 865, 869 (2d Cir. 1990)). Such a remedy is warranted when the constitutional violation is "so egregious, its consequences so grave, and the unlawful restraints already imposed on the petitioner's liberty so lengthy or severe that law and justice mandate unconditional discharge." 2 Randy Hertz & James Liebman, Federal Habeas Corpus Practice and Procedure § 33.3 & n. 11 (4th ed. 1998) (citing cases); <u>see</u> <u>e.g.</u>, <u>Kelly v. Roberts</u>, 998 F.2d 802, 809 n. 11 (10th Cir. 1993) (granting immediate release where petitioner was incarcerated for ten years because prolonging incarceration to allow the state to file a rehearing was unjust); <u>Bowen v. Maynard</u>, 799 F.2d 593, 614 & n. 12 (10th Cir. 1986) (ordering unconditional release where prosecution suppressed evidence strongly suggesting innocence); <u>LaFrance v. Bohlinger</u>, 487 F.2d 506, 507 (1st Cir. 1973) (granting an unconditional writ where "petitioner below had served much, possibly most, of his state sentence").

Here, Green contends that the writ of habeas corpus should be granted or, in the alternative, an evidentiary hearing held. He makes no further argument as to his desired remedy, or even suggests that the People should be barred from retrying him. In any case, "[s]uch an extreme remedy is typically reserved for cases where the fact of

prosecution itself was unlawful, such as in the double jeopardy and ex post facto contexts, or where a conditional writ was granted but the state failed to correct the constitutional error within a reasonable period of time." Garcia v. Portuondo, 459 F. Supp. 2d 267, 294 (S.D.N.Y. 2006); Morales, 165 F.Supp.2d at 609 (citing Latzer v. Abrams, 615 F. Supp. 1226, 1229-31 (E.D.N.Y. 1985)). However, a court may bar retrial, even where the constitutional violation is capable of correction, but "where the petitioner [has] served [an] extended and potentially unjustifiable period [ ] of incarceration before the writ was granted." Morales, 615 F. Supp. at 1230, quoting Latzer and citing United States ex rel. Schuster v. Vincent, 524 F.2d 153, 154, 158, 162 (2d Cir. 1975) (ordering petitioner's immediate and absolute discharge where he had been confined in state hospital for 31 years without opportunity for sanity hearing and he had been in prison for total of 44 years for crime for which average prison term was 15 years)).

That said, "[t]his is not a case in which barring retrial would be appropriate." Garcia, 459 F. Supp. 2d. at 295. While the People have no forensic or medical evidence or third-party eye witness testimony, "this Court is not now prepared to say that no reasonable jury could convict." Id. Further, Green has only served about 5 years in his 35-year sentence. Nor was the performance of Green's trial counsel so well below minimal standards so as to mandate immediate and unconditional release.

### III. CONCLUSION

In sum, to establish a time line as to the underlying events, the Prosecution relied heavily on four pieces of evidence – namely, (1) the Coney Island photograph; (2) the Halloween photograph; (3) the "Turbo-Twister" Speller; and (4) the Law & Order

testimony. The Prosecution characterized the Coney Island photograph as "the one piece of evidence in the whole case that is not capable of lying." The Petitioner's trial counsel had retained prior to the trial and at his disposal a private investigator who could have easily obtained evidence rebutting the Prosecution's timeline. In this regard, the post-judgment investigation uncovered evidence that would have tended to rebut the People's contention that the Petitioner knew B.M. in 1998 and 1999, at the time some of the offenses are alleged to have occurred. Indeed, the Prosecution effectively concedes the dating inaccuracies as related to the first three pieces of evidence.

However, unfortunately, the trial counsel failed to follow through on his obligation to make reasonable investigations, even though he had retained an investigator. This failure takes on added significance where, as here, no eyewitness testimony exists other than that of the alleged victims. In the absence of third-party eyewitness testimony or forensic evidence, the credibility of the accusers goes to the heart of the People's case. Under these circumstances, the Court finds that a "reasonable probability" exists that the outcome of the trial would have been different had the Petitioner received the effective assistance of counsel that would have seriously impaired the People's case.

For the foregoing reasons, it is hereby

**ORDERED** that the Petitioner's motion for a writ of *habeas corpus* is conditionally granted. The writ will issue unless the state affords him a new trial within ninety days of the date of this order; and it is further

**ORDERED,** that the Clerk of the Court is directed to remove the Attorney General from the caption.

**SO ORDERED.**
Dated: Central Islip, New York
August 12, 2013

_Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge